STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

05-268

RAPIDES PARISH POLICE JURY

VERSUS

GRANT PARISH POLICE JURY

**********

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 198,375
HONORABLE HARRY FRED RANDOW, DISTRICT JUDGE

**********

ULYSSES GENE THIBODEAUX
CHIEF JUDGE

**********

Court composed of Ulysses Gene Thibodeaux, Chief Judge, Billy Howard Ezell, and J. David Painter, Judges.

AFFIRMED.

Thomas Overton Wells
1254 Dorchester Drive
Alexandria, LA 71315
Telephone: (318) 445-4500
COUNSEL FOR:
    Plaintiff/Appellee - Rapides Parish Police Jury

Neil Thomas Erwin
Jeansonne & Remondet
401 Market Street - #1250
Shreveport, LA 71101
Telephone: (318) 671-8102
COUNSEL FOR:
    Defendant/Appellant - Grant Parish Police Jury

**Gary L. Keyser**
**1817 Chopin Drive**
**Baton Rouge, LA 70806**
**Telephone:  (225) 927-8399**
**COUNSEL FOR:**
      **Plaintiff/Appellee - Rapides Parish Police Jury**

**Albin Alexandre Provosty**
**John Patrick Doggett**
**Provosty, Sadler, & DeLaunay**
**P. O. Drawer 1791**
**Alexandria, LA 71309-1791**
**Telephone:  (318) 445-3631**
**COUNSEL FOR:**
      **Plaintiff/Appellee - Rapides Parish Police Jury**

**Brian D. Cespiva**
**Gravel, Cespiva, & Wilkerson**
**P. O. Box 1792**
**Alexandria, LA 71309-1792**
**Telephone:  (318) 487-4501**
**COUNSEL FOR:**
      **Intervenor/Appellee - Town of Ball**

**James Patrick Lemoine**
**District Attorney - 35th Judicial District Court**
**P. O. Box 309**
**Colfax, LA 71417**
**Telephone:  (318) 627-2971**
**COUNSEL FOR:**
      **Defendant/Appellant - Grant Parish Police Jury**

THIBODEAUX, Chief Judge.

This case involves a boundary dispute between two Louisiana parishes. Grant Parish, which was carved out of Winn Parish above it and Rapides Parish below it in 1869, contends that its southern boundary line was never definitively established by the legislative act creating it. Grant Parish sought to move the existing boundary line south into what is currently Rapides Parish, transferring approximately 12,000 acres of land, schools, homes, and businesses from Rapides Parish to Grant Parish. Rapides Parish objected and brought suit against Grant Parish. The town of Ball, Louisiana, located in northern Rapides Parish along the boundary line, intervened in the suit against Grant Parish. Surveys presented at trial showed the changing course and size of pertinent rivers and lakes, and their interaction with each other over time. The trial court, after great deliberation and study of the surveys and historical documents, issued a forty-two page opinion finding one of the Rapides Parish surveys historically accurate and in alignment with the legislative intent in 1869 La.Acts. No. 82. That Act created Grant Parish. However, the court ruled in favor of a second Rapides Parish survey which shows a slightly shifted parish line that had been certified by both parishes in 1946, and accepted ever since. That line, called the "Line of Acceptance" was ratified in the Louisiana State Constitution of 1974. The end result of the trial court judgment is that the parish line is not being changed from its previous location, and is now surveyed and established by modern coordinates. Grant Parish filed this appeal. For the following reasons, we affirm the judgment of the trial court.

I.

**ISSUES**

We must decide:

(1)    whether the trial court erred in its duty of determining legislative intent in 1869 La.Acts. No. 82;

(2)    whether the trial court erred in excluding the original Grant Parish survey and related exhibits and testimony[1];

(3)    whether the trial court erred in the weight it allotted to the GLO survey of 1842 and the state patents of 1897 and 1898 offered by Grant Parish;

(4)    whether the trial court erred in determining whether the parish boundary was "uncertain" prior to 1997;

(5)    whether the trial court erred in adopting the "Line of Acceptance" theory in establishing a boundary line; and,

(6)    whether the trial court erred in assessing costs.

II.

## FACTS AND PROCEDURAL HISTORY

Pursuant to Act 82 of March 4, 1869, the Louisiana legislature created Grant Parish out of the southern part of Winn Parish and the northern part of Rapides Parish. The language of Act 82 describes the boundary between Winn and Rapides parishes as a line that begins in the west "at a point on Red River where the Daro empties into said river." From this point, the line then runs east to "the point where Little River empties into Catahoula Lake." The current difficulty lies in the fact that the Red River at the western terminus point has changed its course over time resulting in different intersection points with Bayou Darro. Notwithstanding, the western terminus has changed little since the creation of Grant Parish.

---

[1]Grant Parish also assigns as error that the trial court improperly excluded the revised survey of Grant Parish. However, that issue has been reviewed by this court and by the Louisiana Supreme Court and will not be addressed herein as it is does not fall into any exception allowed under the "law of the case" doctrine.

2

The major point of contention in this litigation involves the eastern terminus. The difficulty here arises in the fact that Catahoula Lake at the eastern terminus point is an ephemeral lake that swells at times and dries up completely at times, and the Little River does not empty into the lake, but rather cuts through the lake bed. Therefore, the Little River *appears* to empty into Catahoula Lake at different locations at different times depending on rainfall and the level of the water in the lake. There was no map attached to or referenced in Act 82 of 1869. The current litigation involves three different positions for the parish line. The most northerly line is the existing line, advocated by Rapides Parish and the Town of Ball, and will be referred to herein as the USGS Line, or The Quad Sheet Line, or the Line of Acceptance. The middle line will be referred to as the Bringhurst Line. The most southerly line, advocated by Grant Parish, will be discussed as the 1838 GLO Line.

In 1869, when Grant Parish was created at the request of local citizens of Winn Parish and Rapides Parish, the new parish initially had no legislative body, no police jury, and no parish surveyor of its own. At that time, Captain R. W. Bringhurst was the Rapides Parish surveyor, and he remained so until the early 1900's. Captain Bringhurst generated a parish map between 1871 and 1875 that appears to most accurately depict the new parish line as described in Act 82 of 1869. That line is now being called "The Bringhurst Line." The Bringhurst map was reportedly used continuously by both Grant Parish and Rapides Parish until some time between 1930 and 1940.

At some time around 1940, the east end of the Bringhurst parish line was shifted northerly by about 1,600 feet as depicted by cartographers, resulting in its modern portrayal on parish maps prepared by the Louisiana Department of Highways and the United States Geological Survey (USGS) quadrangle maps (quad sheets). No explanation has been given for this northerly shift except perhaps the current

knowledge that the perception of the eastern terminus changed with the condition of the Catahoula Lake bed. However, this USGS or Quad Sheet Line has been used continuously for approximately 60 years by both parishes in all official respects; and has been used repeatedly and without exception by Grant Parish's own surveying firm for this litigation, Pan American Engineers (PAE), in the preparation of the firm's many maps and surveys.

In 1946, the police juries of Grant Parish and Rapides Parish took official action to certify this common boundary line. More specifically, on May 11, 1946, Grant Parish, by unanimous resolution, certified the boundary as portrayed on Louisiana Department of Highway maps. Three days later, on May 14, 1946, Rapides Parish passed a similar resolution. The certified boundary in the Louisiana maps coincides with the United States Government Quadrangle maps, which have been used by both parishes, and is now being called the "Line of Acceptance." In 1947, both police juries created parish planning boards, declaring and filing these maps as their official parish maps, and using identical transmittal letters to the State.

Article 6, Section 1 of the 1974 Louisiana Constitution ratified the boundaries that were previously certified by the resolutions of both parishes. That section reads, in part, as follows:

> (A) Parishes and Boundaries Ratified. Parishes and their boundaries as established on the effective date of this constitution are recognized and ratified.
>
> (B) Creation; Dissolution; Merger; Boundaries. The legislature by law may establish and organize new parishes, dissolve and merge parishes, and change parish boundaries if approved by two-thirds of the electors in each parish affected voting thereon at an election held for that purpose.

There is no evidence of an attempt at any time to change the parish boundary by two-thirds vote.

4

In 1997, the Grant Parish Police Jury, asserting apparently for the first time, that the boundary line was never definitively established, passed an ordinance "to ascertain and fix the boundary line which is common to both Grant and Rapides Parish," pursuant to the provisions of La.R.S. 50:221, which delineate the procedural steps to be taken when fixing parish boundaries. Grant Parish appointed Pan American Engineers ("PAE") to survey the common boundary line and served Rapides Parish with notice of its intent to fix the boundary.

Grant Parish did not attempt to survey and fix the boundary as it existed on the modern USGS Quadrangle Maps since the 1940's. Nor did Grant Parish attempt to fix the boundary as it existed on the Bringhurst Map. Rather, Grant Parish relied on an ancient map plotted over a twenty-five year period beginning in 1813 and ending in 1838. This map, called the GLO (General Land Office) township plat, was approved in 1842, twenty-seven (27) years before the creation of Grant Parish in 1869, and is at the core of the dispute. It depicts a crude gooseneck-shaped structure, similar to a horizontal "S," projecting from west to east far out into Catahoula Lake. This map also depicts the Little River following the curve of the structure, more or less dead center in the gooseneck, and shows the Little River emptying out of the mouth of the gooseneck into Catahoula Lake, significantly south of the boundary certified in 1946 and ratified in 1974. Accordingly, Grant Parish surveyed a parish line based upon the gooseneck structure depicted in the 1838 GLO Plat.

The Grant Parish survey, based upon the 1838 GLO Plat, moved the east end of the existing boundary line south by over a mile, and the west end of the boundary line south by about 750 feet. This change would reallocate 12,000 acres of land containing schools, subdivisions, family homes and commercial enterprises to Grant Parish. Rapides Parish asserts that the change would also increase tax revenues for Grant Parish in excess of $1,000,000.00 per year. Testimony indicates that if the

5

parish boundary is changed to correspond with the Bringhurst Line which lies between the current line and the line urged by Grant Parish, Rapides Parish will lose approximately 3,000 acres of land and 465 residential properties.

Rapides Parish asserts that, while the boundary line was never definitively established *by conjoint survey on the ground,* the boundary had never been disputed since the creation of Grant Parish, and that Grant Parish's current motivation for "fixing" the boundary is nothing more than a land grab to increase its tax revenues. Rapides Parish appointed Frank Willis as its surveyor, and asserts that he appeared at the designated time and place to begin the surveying efforts. Rapides Parish further asserts that Grant Parish and PAE began their survey work based upon a preconceived and erroneous premise, and for this reason a conjoint survey was not possible. Grant Parish asserts non-cooperation by the Rapides Parish surveyor. In any event, the two surveyors did not agree on methodology and worked independently of each other.

In preparation for trial in November 2002, the trial court issued pre-trial and scheduling orders setting cutoff dates and procedures, including procedures for the voluntary and agreed-upon exchange of written export reports disclosing all opinions to be expressed at trial. At an August 2, 2002 status conference, the trial court learned that some Grant Parish experts had failed to submit comprehensive reports regarding their opinions. In reviewing the reports submitted, the trial court found them to be in violation of the pre-trial orders, and limited those experts to testify only as to the information in their reports. Grant Parish appealed, and this court and the Louisiana Supreme Court affirmed the trial court ruling on that issue.

On August 22, 2002, asserting gross errors, misleading statements, and the use of improper methodology in the Grant Parish survey, Rapides Parish filed a motion in limine to exclude the original PAE survey of Grant Parish. In October

6

2002 the trial court continued the hearing on the motion in limine specifically deferring the hearing to the trial on the merits.[2]

In September 2002, due to the errors in its original survey, Grant Parish submitted a revised boundary retracement survey. However, the trial court excluded the revised survey as being offered too late under the court's scheduling order. This court denied the writ application filed by Grant Parish on this issue, as did the Louisiana Supreme Court.

On November 12, 2002, on the first day of trial, Rapides Parish reurged its motion in limine to exclude the original PAE survey and accompanying testimony and exhibits, arguing improper methodology and failure to meet minimum standards in the preparation of the survey. After a two-day hearing, during which all three of the PAE surveyors, their party chief, and an expert in survey methodology, standards and procedures were examined, the trial court ruled in favor of Rapides Parish. Grant Parish immediately applied to this court for emergency supervisory writs. Finding no showing of irreparable harm, this court denied writs on this issue on November 14, 2002, but allowed Grant Parish to proffer the survey and accompanying exhibits for consideration on appeal.

After a trial on the merits, lasting approximately two weeks, during which testimony was given by approximately forty witnesses, either live or by stipulation or deposition, and well over two hundred exhibits were examined, the trial court took the matter under advisement. The trial court produced an extremely comprehensive analysis of all of the issues. The trial court rendered judgment in favor of Rapides Parish and the Town of Ball, and judicially established the parish

---

[2]The trial court in its forty-three page Reasons for Judgment inadvertently stated that the motion in limine sought to exclude the *revised* survey due to improper methodology and untimeliness. However, the motion addressed the original survey, and was based upon improper methodology.

boundary line as the line surveyed by expert surveyor Frank Willis, essentially re-establishing the line of the existing USGS Quadrangle Maps, also known as the Quad Sheet Line, also known as the Line of Acceptance, as the official parish boundary. The boundary description ruled upon by the trial court reads as follows:

> Commence at a point located at latitude 31 degrees 23 minutes 29.0203 seconds north, longitude 92 degrees 37 minutes 55.3123 seconds west, said point marking the point of beginning. From point of beginning, run northeasterly to the eastern terminus, said terminus having a latitude of 31 degrees 28 minutes 46.9037 seconds north, longitude 92 degrees 11 minutes 52.1355 seconds west.
>
> The line described hereinabove is a grid line based upon the Louisiana State Plane Coordinate system, North Zone. The geographic coordinates of the end points of the line are based upon the North American Datum of 1983.

For the reasons discussed below, we affirm.

III.

## LAW AND DISCUSSION

### Standard of Review

An appellate court may not set aside a trial court's findings of fact in absence of manifest error or unless it is clearly wrong. *Stobart v. State, Through DOTD*, 617 So.2d 880 (La.1993); *Rosell v. ESCO*, 549 So.2d 840 (La.1989). A two-tiered test must be applied in order to reverse the findings of the trial court:

(1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and

(2) the appellate court must further determine that the record establishes that the finding is clearly wrong (manifestly erroneous).

*Mart v. Hill*, 505 So.2d 1120 (La.1987).

Even where the appellate court believes its inferences are more reasonable than the fact finder's, reasonable determinations and inferences of fact

8

should not be disturbed on appeal. *Arceneaux v. Domingue*, 365 So.2d 1330 (La.1978). Additionally, a reviewing court must keep in mind that if a trial court's findings are reasonable based upon the entire record and evidence, an appellate court may not reverse said findings even if it is convinced that had it been sitting as trier of fact it would have weighed that evidence differently. *Housely v. Cerise*, 579 So.2d 973 (La.1991). The basis for this principle of review is grounded not only upon the better capacity of the trial court to evaluate live witnesses, but also upon the proper allocation of trial and appellate functions between the respective courts.[3]

**Legislative Intent**

Grant Parish contends that "[t]he trial court erred in failing to adopt as its analytical framework in this case its duty of determining legislative intent in the adoption of the legislative act creating Grant Parish, Act 82 of 1869." We disagree. After listening to ten days of trial testimony and reviewing approximately 235 exhibits, the trial court issued an extremely comprehensive analysis of the intent of the legislature in creating Grant Parish in 1869. On the first page of its lengthy Reasons for Judgment, the trial court delved into the history of Act 82, and continued to provide an exhaustive analysis of legislative intent, as follows:

Historical Summary

The Louisiana Legislature on March 4, 1869 by Act 82 created Grant Parish. The newly created parish was formed from parts of Rapides Parish and Winn Parish. The

---

[3]This court's own research developed basic information helpful in understanding the issues in this matter.

– The largest subdivision of land is the Township which measures six miles square.
– Each township contains 36 sections; each section has an area of one square mile (640 acres).
– The Office of the Surveyor General was created in 1796 to survey lands during the westward expansion.
– In 1836 the office was placed under the jurisdiction of the General Land Office (GLO).
– In 1849, the GLO was moved under the Department of the Interior.
– The Office of Surveyor General was closed in 1925; surveying responsibilities remained with the GLO.
– In 1946, the GLO was abolished; surveying duties transferred to The Bureau of Land Management (BLM).
– A "GLO Township Plat" is a General Land Office map that covers a certain township.
– A "USGS Quad Map" is a topographical quadrangle map published by United States Geological Survey.

language of Act 82 describes the boundaries of Grant Parish as follows:

> *Commencing at a point on Red river where the Daro empties into said river, and thence running east to the point where Little river empties into Catahoula Lake; thence up Little river to the junction of the Castor and Duddemonia, thence west on the southern boundary of the parish of Winn to the range line between ranges numbers two and three west, thence south on said range line to the township line between townships numbers eight and nine north, thence west on said township line to where said line crosses the Rigolet de Bon Dieu; thence down said Rigolet de Bon Dieu to the mouth of Cane river, thence down Red river to the point of starting, the mouth of the Daro.*

According to the report of Thomas Howell, Ph.D., the head of the history department at Louisiana College, at the time that Grant Parish was created, the original idea of prominent local citizens was to create a new Parish out of south Winn, east Catahoula, and north Rapides Parishes. This new parish was to be called Red River Parish and the courthouse was to be located in the Town of Montgomery. William Calhoun, a debt-laden local plantation owner and member of the legislature, sabotaged this plan. Mr. Calhoun changed the original legal description of the new parish before it was accepted by the Louisiana legislature so that his plantation (now the Town of Colfax) would be the parish seat. Mr. Calhoun also changed the name of the new parish from Red River to Grant Parish.

. . . .

The Legislative Act

The pertinent part of the legislative act that defines the common boundary between Grant Parish and Rapides Parish provides:

> *Commencing at a point on the Red river where the Daro empties into said river, and thence running east to the point where Little river empties into Catahoula Lake; . . . thence down Red River to the point of starting, the mouth of the Daro.*

The starting point of the court's analysis is the interpretation of this part of the act. The court is of the opinion that the clause italicized above is vague and ambiguous, both in its description of the western terminus and in its description of the eastern terminus of the parish boundary, making the boundary subject to differing interpretations.

(Emphasis in original).

The trial court then discussed the ephemeral nature of Catahoula Lake and the failure of Act 82 to "define at what stage Catahoula Lake was intended to be at the time the boundary was established." The trial judge continued his analysis:

The legal description in Act 82 did not reference a map and all efforts to find any map or cartographic depiction indicating the intent of the legislature were without success. LSU Professor Ernest Easterly, Ph.D., attorney and geographer, testified of his exhaustive search of the Louisiana legislative records, the National Archives and other records in an effort to find references to a map or other evidence of the legislative intent. Frank Willis, land surveyor and civil engineer, testified to an exhaustive search of the records of Grant and Rapides Parishes, the LSU libraries, the Louisiana State Land Office and other potential sources for any evidence of a map that might have been attached to Act 82. Their search failed to produce any such evidence. In fact, their search failed to locate the original petition submitted to the legislature. However, various newspaper articles published around the time of the creation of Grant Parish, together with the 1927 affidavit of Jonathan I. McCain, point to the establishment of Grant Parish as a local idea. The report of Dr. Thomas Howell on the history of the creation of Grant Parish supports the idea that local individuals established the line for local purposes, political, economic, and/or personal. Additionally, since the parties involved were local, almost certainly with continuing political ambitions, Dr. Howell opined that the parties would be more likely to draw a line that would cause as little disruption and local discontent as possible. Splitting settled areas where property was already in private hands would not likely please the owners. Lastly, Dr. Howell opined that it is more likely than not that William Calhoun (and his friend Governor Warmouth) had reason to make the new parish exclusive rather than inclusive. As a result, Calhoun would have been less likely to choose a line with Rapides Parish that would have included in Grant Parish a number of additional property owners at least some of who [sic]

11

would be less likely to oppose anything Calhoun wanted. To support this idea, Dr. Howell notes that the new parish was significantly smaller than the originally proposed "Red River" Parish. Not only was some of the Winn Parish testimony [territory] left off but also all of the Catahoula Parish territory was omitted. Whether the line with Rapides Parish was different between the "Red River" and the Calhoun proposals is unknown. However, Calhoun clearly intended to create in Grant Parish an entity that he could control politically.

Other than evidence of various newspaper articles and personal accounts supporting the idea that the establishment of Grant Parish was a local idea, there is virtually no evidence in the record of legislative intent. As noted above, the parties were unable to locate evidence that a map was attached to the original legislation and were, in fact, unable to locate the original petition submitted to the legislature. Evidence of the journals of the House and Senate of 1869 for the legislative history of Act 82 was not submitted. From the scant evidence of legislative intent available for consideration, the court accepts the testimony of Dr. Thomas Howell, Ph.D. as summarized above, and concludes that the legislature would have been more likely to have intended to exclude territory from Grant Parish than to have included it.

In previous cases involving boundary disputes where the court is called upon to interpret a statute defining a parish boundary, the courts have looked to historical evidence in the form of maps drawn near the time of the creation of the new parish. While map compilers can not legally fix or establish any boundary other than that defined and called for by the act, the courts have given import to the maps drawn by the map makers of the time, stating "when they marked and fixed the line on these maps . . . , they must have had good reason to believe that they were doing what the legislature intended them to do." St. Martin Parish Police Jury v. Iberville Parish Police Jury, 33 So.2d 671[, 679] (La. 1947).

The court then outlined the cartographic inaccuracies in specific maps entered into evidence, and stated that the ambiguities in the statute caused map makers great difficulty. The court discussed the work of expert surveyor, Frank Willis, and his discovery of a map depicting the parish line after much research and investigation in the files of the State Land Office in Baton Rouge:

12

It was prepared by Captain R.W. Bringhurst who served as Rapides Parish surveyor (and a civil engineer) before, during and after the creation of Grant Parish. According to testimony, this map was probably prepared before 1869, and updated sometime between 1871 and 1875 to add demographic data for the new shape of Rapides Parish and to add the parish line common to Rapides and Grant. Frank Willis testified that the Bringhurst map, although not a survey, was invaluable to his work in determining the location of the boundary in part because the Bringhurst map showed natural monuments of both the west and east end of the parish line as they existed around 1869 near the time of the creation of Grant Parish. Both Frank Willis and Ernest Easterly, III, expert geographer, testified that Captain Bringhurst, as a reputable parish surveyor for Rapides Parish both before and after the formation of Grant Parish, was probably the most competent contemporary cartographer for determining the parish boundary.

The trial court continued analyzing legislative intent, providing exhaustive detail regarding the western terminus, where Bayou Darro emptied into the Red River, and the eastern terminus, where the Little River "emptied into" Catahoula Lake.

With regard to the western terminus, after hearing expert testimony from Rapides Parish surveyor for this litigation, Frank Willis, and expert hydrologist, Dr. Paul Kemp, the trial court concluded that "the western terminus of the boundary line dividing Grant and Rapides Parish as defined by the legislative act is that point where the thread of Bayou Daro meets the mean low water line of Red River."

The Rapides Parish surveyor, Frank L. Willis, is a registered professional civil engineer, registered professional environmental engineer, and registered land surveyor in Louisiana who has taught engineering courses at LSU in statics, hydraulics, elementary and advanced surveying, and engineering graphics. Mr. Willis testified regarding the swift currents and erodible alluvial soil in the Red River flood plain. His knowledge of the Red River was impressive and went beyond his professional credentials, as Mr. Willis testified that his firm did the hydrographic surveying on the Red River for the U.S. Army Core of Engineers on a navigation

project for two years. Mr. Willis also testified that he is from Boyce, Louisiana; he grew up on the Red River and personally witnessed the River move from 1966, when he was in high school, until the year 2000.

Mr. Willis testified that he physically walked and "hacked" the 27-mile parish line from Boyce to the Catahoula Lake. The court assessed first-hand Mr. Willis' methodology and his conclusions that between 1938 and 2000, the Red River moved more than 3000 feet, and the mouth of Bayou Daro moved north as the river changed course. The trial court also heard the testimony of Dr. Paul Kemp, Ph.D., who is a hydrologist and associate professor with the LSU School of the Coast and Environment. Dr. Kemp's testimony substantiated Mr. Willis' opinion that the Red River had moved in a northeast direction since 1869.

The trial court detailed the tools and techniques that Mr. Willis used to determine the location of Bayou Daro in 1869, including the location of natural monuments, the GLO survey of 1850, and a survey map of James O'Shee, Deputy Parish Surveyor in 1893. In his impressively comprehensive survey report, Mr. Willis stated that he also used the 1871-1875 Bringhurst map because it was a "contemporaneous document" that directed him to the natural monument, the mouth of Bayou Darrow; he stated that it was just as valuable as an actual field survey. Also in his survey report, Mr. Willis includes an excerpt from a legal description he found in the Partition of the Bush-Darro Plantation, an estate located on the Red River at the "mouth of Bayou Darro" in the 1800's. Mr. Willis further stated in his survey report:

> Grant Parish surveyors involved in this litigation did not find the O'shee map and the Bush Partition located in the records of the Grant Parish Clerk of Court. Therefore, they did not find a tie point close by. The Grant Parish Surveyors surveyed from a reference point 7.3 miles away using 1850 GLO field notes and assumed that the bearings and distances shown in the GLO notes were perfectly accurate – something [that is] simply not true.

14

In his survey report, Mr. Willis stated that because the Red River bank of 1850 had been washed away by the extensive movement of the river, he could not physically retrace the exact steps of the 1850 GLO surveyor, except to enter the bearings and distances he recorded. However, he did locate objects on the ground in the field and correlate them with monuments in the surveys. At one stage of the survey process while correlating a geo-referenced 2000 infrared image with the maps and surveys from the 1800's, Mr. Willis reported with great enthusiasm of noting a ridge or "different thermal return" and excitedly going out in the field in the rain and finding the ridge "right in the middle of O'Shee's line." Mr. Willis testified in detail regarding numerous specific, and sometimes "astounding," correlations that he made during his survey.

Mr. Willis found textual evidence in O'Shee's 1893 survey that O'Shee had readily seen and used the 1850 GLO corners and lines. This was significant to him. This meant that he could tie O'Shee's 1893 map to the 1850 GLO survey, compare the location of the mouth of the Darro in 1850 with its location in 1893, and after great amounts of study and research using many disciplines, calculate the movement of the river and establish the location of the mouth of the Darro in 1869. His tools included the civil engineering principles of river hydraulics, advanced photogrammetric techniques, aerial photographs taken over a sixty-two year period, orthorectification and georeferencing processes, precisely scaled map overlays, and state of the art Global Positioning Systems with a precision more accurate than one inch in one hundred miles. Mr. Willis ultimately tied all of his work to the Louisiana State Plane Coordinate System.

In the final analysis, in spite of the movement of the Red River and the excavation of it by the Army Core of Engineers, Mr. Willis reported that the western terminus had remained essentially the same as it was in 1869.

With regard to the eastern terminus, the trial court discussed the testimony of Dr. Ernest Easterly, III, LSU Professor and geographer, regarding the legislative definition of the eastern terminus, "the point where Little River empties into Catahoula Lake." Dr. Easterly had previously studied Catahoula Lake and had written a scholarly paper on the ephemeral nature of the lake. He referenced the conflicts in historic maps and the confusion and misunderstandings regarding a temporary lake generally formed during flood times. Dr. Easterly testified that the Little River passes through the Catahoula Lake Basin, becoming a mere channel within the lake when the basin fills with water.

Dr. Easterly further observed that Little River formed an actively accreting lacustrine delta, building upon the bed of Catahoula Lake. This delta extended along the course of Little River over the basin floor advancing farther into the lake since 1812, and changing surface locations since the time of mid-nineteenth century surveys. Dr. Easterly opined that the "chicken neck" structure shown in various maps is located in the lake bed, and that early geographers did not understand the uniqueness of an ephemeral lake and its changing nature. Dr. Easterly's expert opinion was that Little River could be said to "empty" into Catahoula Lake at its high water stage, at the thirty-six foot contour.

Expert surveyor Frank Willis provided extensive testimony at trial and via his eighty page survey report regarding his search for legislative intent in the eastern terminus. In his report, Mr. Willis explained that the hydrology and topography of Catahoula Lake are different from the same features on normal lakes that maintain a fairly constant water level. He stated that when Little River is within its banks it runs all the way through the Catahoula Lake bed and exits on the east side of the lake. When Little River exceeds its banks, it spreads out to form Catahoula Lake. Catahoula Lake is an ephemeral lake, normally dry for part of the year and at

16

full bank level or higher during other times depending on the levels of outfall streams and the flooding conditions in the rivers downstream.

Mr. Willis also explained levee formation in the Catahoula Lake bed. Thin ridges run along the edges of Little River for its full route through the lake basin all the way to the point where the river exits the lake. These ridges are called natural levees, and are formed when the river floods over its banks and slows down, dropping its sand and silt load. This sediment forms higher ground along the edge of the river, the natural levee. These natural levees are readily visible today. The tops of the levees get lower very gradually as they progress out into the lake. They drop in elevation only about one foot per mile. Consequently, a rise in the water level of only one foot will inundate an additional mile of the natural levee. The natural levees along Little River are inundated regularly.

Mr. Willis determined that "[t]he Bringhurst map shows the most authoritative, contemporaneous, accurate and locally accepted definition of the point where the Little River emptied into Catahoula Lake in 1869 when Grant Parish was created." The Bringhurst map depicted the Little River delta extending out into Catahoula Lake when the lake is at a stage below the ordinary high water line. The 1838 GLO Plat relied upon by Grant Parish was also rendered during a low-water survey. By comparing the Bringhurst map, which by all indications was made around 1869, with the 1838 GLO Plat relied upon by Grant Parish, and with an 1884 GLO Map by a surveyor known to Mr. Willis to be very reputable, Mr. Willis discovered many inaccuracies in the 1838 GLO survey.

For example, Mr. Willis determined that the true shoreline of Catahoula Lake was not far out on the low water delta as shown in the 1838 GLO Plat, and that the Little River was not in the location depicted in the 1838 GLO Plat. Subsequently Mr. Willis proved that the Little River, unlike the Red River in the western terminus,

17

had not moved over time. Mr. Willis found that the Bringhurst map actually depicted two outlets of the Little River emptying into Catahoula Lake during low water levels, indicating that Bringhurst actually walked on the low water delta and personally observed the first outlet into Catahoula Lake. While the second outlet was not shown on the 1838 GLO Plat, Mr. Willis found remnant evidence of the outlet on a 1994 Quadrangle Map of Holloway, Louisiana, thereby confirming his assessment of the Bringhurst Map and the unreliability of the 1838 GLO Plat. Mr. Willis testified at trial that the maps relied upon by Grant Parish do not accurately depict the proper location of the gooseneck structure, or the "S" curve of the Little River and its delta, which is what this court understands the gooseneck structure to be.

Mr. Willis stated that the water levels on the natural levee on the river delta could have confused the original 1838 GLO surveyor. The flat longitudinal slopes of the natural levees, and a one foot rise or fall in the lake would inundate or expose almost a mile of natural levee thereby shifting the 1838 GLO surveyor's definition of the mouth by that much. Mr. Willis stated that if one combines the flat longitudinal slope of the natural levees with the GLO surveyor's lack of long-term knowledge of this ephemeral lake and his lack of civil engineering training, it is easy to see how he could have erroneously determined the location of the lakeshore in 1838 during a low-water survey. Mr. Willis further stated that a one foot change in the water level of the lake can shift the location of the water's edge on the Little River Delta by about 4,000 feet.

He stated that this phenomenon is one of the primary reasons that the courts have repeatedly ruled that lakes themselves are natural monuments and are the boundary, not the GLO meander lines. In the case of Catahoula Lake, the problem is complicated by daily water level fluctuations as well as the fluctuations from 1838 to 1869 when Grant Parish was created. Mr. Willis provided comparative sketches

18

of the lake bed and surrounding vegetation and wildlife during different water level stages which were very helpful in understanding how natural changes, lack of knowledge, and imprecise equipment, can undermine the integrity of a survey.

Mr. Willis testified in great detail as to how he and other Rapides Parish experts were able to establish through scientific analysis and aging of cypress trees that the Little River had not moved in its approach to Catahoula Lake since prior to 1869. Rapides Parish introduced the report of Joy Young, Ph.D., a dendroecologist who specializes in physiology and the aging of cypress trees. Dr. Young obtained core samples of the cypress trees along Little River in the area of Catahoula Lake. Her report demonstrated the existence of cypress trees, hundreds of years old, in the same location that the 1838 GLO surveyor placed the Little River, and where Grant Parish surveyors purportedly "retraced" it.

The subject cypress trees, which were individually identified, tagged, and aged, cannot germinate in water, and therefore could not have existed in the channel of the Red River in the 1800's. The findings of Dr. Young were corroborated by the testimony of Lewis Peters, a prominent forester. By scaling the true location of Little River and the placement of it in the 1838 GLO survey, Mr. Willis stated that the error exceeds the GLO minimum requirements.

After evaluating all of the evidence, the trial court stated that the ephemeral nature of Catahoula Lake was not a recognized fact until Drs. Russell and Brown completed and published an important study in 1942 establishing that in 1812, when Louisiana gained statehood, the shoreline of Catahoula Lake has a thirty-six foot contour. This corresponds with a 1942 survey plotted by Heard and Daigre for the Carter Oil Company, and with evidence established by the State of Louisiana, and correlates with the line depicted by Bringhurst, and the personal observations of Mr. Willis in the field.

19

The trial court also stated that it was cognizant that Act 82 was passed in March of 1869 when the Catahoula Lake is normally at its high water stage. That indicates to this court that the Little River delta, or the gooseneck structure, in the lake bed would have been under water, and that Little River would appear to "empty into" the Catahoula Lake at a much more northerly location than that depicted by the 1838 GLO Plat relied upon by Grant Parish. Additionally, the court found no convincing evidence that the legislature considered the GLO maps in creating Grant Parish. Ultimately the court found the arguments of Grant Parish to be unpersuasive that the eastern terminus—where Little River "emptied into" Catahoula Lake—was located at or near the gooseneck or chicken neck structure.

The court concluded that "the boundary line, including the western terminus and eastern terminus points, originally depicted by Captain R. W. Bringhurst and surveyed by Frank Willis makes the most reasonable argument to the Court that this is the boundary line intended by the language of Act 82 of the Louisiana Legislature in 1869."

Based upon the foregoing, and our review of the record and the many exhibits, we believe that the trial court conducted an exhaustive search for legislative intent, completely fulfilling its duties in that regard. We also believe that the trial court was correct in its determination that the legislative act creating Grant Parish was ambiguous, susceptible to speculation, doubt, and multiple interpretations dependent upon whether Catahoula Lake was considered at its high, medium, or low water mark. Accordingly, we find no error in the trial court's continuing its analysis beyond the search for legislative intent, particularly given the facts of this case which is before us 136 years after the legislature created the boundary, and given the intervening historical events, enactments, and changes in the law that have affected this boundary in the last 136 years.

### *Exclusion of the Original Grant Parish Survey*

Grant Parish asserts that the trial court erred in excluding the Grant Parish survey and related exhibits and testimony in a hearing on the day of trial where the survey was necessary for the determination of the legislature's intent in its description of the parish boundary line in Act 82.

As a threshold matter, Grant Parish complains of surprise and implies unfair surprise regarding the *Daubert*-type hearing on the first day of trial. However, the record reflects that there was no unfair surprise in the court's actions. More specifically, Rapides Parish filed an August 2002 motion to exclude the Grant Parish survey based upon misrepresentations and the use of improper methodology in the preparation of the survey by Grant Parish surveyors. Subsequently, the trial court continued the hearing on the motion and specifically stated in its October 2002 order that "the Rapides Parish Police Jury shall have the right to reurge this motion at trial on the merits." Accordingly, on the first day of trial on November 12, 2002, Rapides Parish reurged its motion. Because this right was specifically referred to the trial on the merits, and because it is logical that a motion to exclude evidence would be heard at the very beginning of trial, prior to any attempts to introduce the opposed evidence during trial, there is no justification for a party to complain of surprise in this case.

We find no abuse of discretion with regard to the trial court's decision to grant the motion to exclude the survey. The hearing on the survey lasted two days. The Grant Parish survey was conducted by the firm, Pan American Engineers (PAE), and all three of the surveyors of that firm who had affixed their seals to the PAE survey testified at the hearing. Evidence adduced revealed that the errors in the survey run the gamut from form to substance. Surveyors Thomas C. David, Jr., William J. Wood, and Jerry W. Boswell all signed and affixed their professional seals to the PAE survey, and each one admitted that he had failed to designate the specific

subject matter in the survey for which he was responsible. Such designation is a requirement under the rules and regulations governing licensed surveyors, pursuant to Section 2505(C) of those rules, where more than one surveyor affixes a professional seal to a survey.

Mr. David admitted that he had not reviewed certain field notes or performed closure calculations before signing and affixing his seal to the survey. In fact, no closure calculations were done at all in the original survey. Mr. David admitted that closure calculations were a mathematical test to determine whether or not your extended traverse lines meet standards or whether they require adjustments. Mr. David admitted that closure calculations are an essential part of the survey, and must be done before the survey is completed and signed and sealed because the signature and seal certify that the survey is accurate and meets minimum standards.

Testimony and evidence at the hearing revealed errors in the survey in depicting both the eastern and the western ends of the common boundary line between Grant Parish and Rapides Parish. The western terminus of the boundary line involved the search for the point where Bayou Darro emptied into the Red River, and in more modern terms that location is in the vicinity of Township 5 North, Range 3 West. At the hearing, Mr. David stated that Bayou Rigolette was depicted on the PAE survey because it was believed to be a tie, that it crossed two section lines and the surveyors were trying to tie it in and use it as a reference to a section corner. However, the PAE survey contained contour lines depicting the Bayou Rigolette running over the top of a 130 foot hill. When asked how this was possible, Mr. David stated that, "it is not surprising to find a GLO plat showing a stream and when comparing to current locations to be off." He further stated, "Now, if it is for some reason mis-plotted, all we'd have to do is take the GLO plat, compare it to that and say is it mis-plotted or not." He stated that the lines were not meandered but just

sketched in. The end result is that the survey apparently had unexplained ambiguities and credibility problems. Rapides Parish posed the valid question to Mr. David regarding the accuracy of the entire survey if the tie points are "just as accurate" as Bayou Rigolette running over 130 foot tall hills.

Rapides Parish further took issue with the PAE depiction of Bayou Darro, an important natural monument in determining the western terminus of the common boundary line. Specifically, the PAE survey shows Bayou Darro narrowing from 150 feet in width to 50 feet in width in only one half of a mile as it approaches the Red River. Accordingly, Rapides Parish asked how a water course can reduce that much in width in that short a distance and still carry the same amount of water. Additionally, the GLO field notes described Bayou Darro as being 264 feet wide, not 50 feet wide, at the same point. Ultimately, Mr. David explained that he believed that the GLO surveyor measured on the diagonal. The practice of measuring on the diagonal was questioned by Rapides Parish. Notwithstanding whether this was or was not an accepted practice, the end result is that the PAE survey did not clarify this point and rendered a water course with impossible dimensions as it flowed toward another body of water, with both bodies of water having important significance to the current litigation.

With regard to the eastern terminus which involves the search for the point where the Little River "empties into" Catahoula Lake, when asked about the PAE survey's plotting of the course of the Little River in a particular section, Mr. David admitted: "As plotted from the DO – GLO plat for this township, Township 6 North, Range 3 East. The – it does show a connection over here in the Township 6 North, Range 2 East, but I know that is not correct." When asked whether the river existed as depicted in the survey in Range 2 East, Section 24, Mr David admitted: "It's – it is not an accurate representation of Section 24." Mr. David further admitted

23

that the survey contained "graphic misrepresentations" of the Little River in that area, and the plotting did not follow the GLO field notes in that township.[4]

Also in the eastern terminus, which is where the largest discrepancy exists between the two parishes' assertions, the PAE survey depicts the edge of Catahoula Lake extending to the extreme northeast corner of Section 20 of Township 6 North, Range 3 East, a point that Rapides Parish asserts is fifty-two feet above sea level. Mr. David agreed with testimony that his survey depicted the lake at thirty-five feet mean sea level, and depicted the eastern terminus point where the Little River empties into the lake at twenty-nine feet mean sea level. At the hearing, Rapides Parish asked, and Mr. David responded, as follows:

> Q.  It's all here at one time and place, it's at 35 feet mean sea level, the eastern terminus point's at 29 feet and the northeast corner is at 52 feet. How can that be possible?
>
> A.  Changes of terrain, changes of time, and I didn't make no statement of the correlations of elevations, I – I don't know what that means. Ask your experts, I don't know."
>
> Q.  You don't understand your survey plat, do you?
>
> A.  I'm not involved in horizontal elevations ordered, I – I mean vertical – I was involved in horizontal distances. . . .

During his testimony, Mr. David admitted that he did not know how to work a computer or cad equipment. He further admitted that he did not consider elevations and could not explain the anomalies in the survey, but stated that he did understand the concept of water seeking its own level. He stated that he was not asked to go out there and figure elevations and had no idea what the correlations

---

[4]It is worth noting at this juncture that the PAE survey depicted with pink dotted lines, a second course for the Little River, showing it as having moved over time, which was convincingly refuted at trial by Rapides Parish experts.

between the three different elevations meant to his survey, which he stated was "a retracement survey."

However, when asked whether they had meandered courses and followed the footsteps on the ground of the original GLO surveyor, which methodology is required in a "retracement" survey, the Grant Parish surveyors admitted that they had not. The hearing transcript contains approximately seventy pages of detailed examination of the three Grant Parish surveyors by Rapides Parish, regarding the specific surveying techniques used, and relating their testimony to their own survey and exhibits in evidence in open court. At the conclusion of the examination of each surveyor by Rapides Parish, and upon tender of each, essentially the only question asked by Grant Parish of its own surveyors was, "what is your degree of competence [confidence] in the survey meeting its stated goal." The recited goal was to equate legislative intent with the gooseneck peninsula shown on the 1838 GLO plat, and each surveyor simply stated that he felt he had met that goal. No attempts were made by Grant Parish to rehabilitate the damaging testimony regarding the mistakes marked on the survey in open court, or to address the specifics of the methodology used in preparing the survey, or to refute the negative evidence adduced by Rapides Parish.

Following the testimony of the three PAE surveyors and their crew chief in the field, expert testimony at the hearing indicated that the PAE survey was not what it purported to be, "a retracement survey," because proper methodology was not followed in rendering the survey. More specifically, the PAE surveyors entitled their survey a Retracement Survey, and their Proces Verbal stated that, "The meandered courses and distances were tied to section corners and therefore could be reasonably re-established utilizing survey retracement techniques to in effect follow the footsteps of the original surveyor. By retracing the meander lines, we could re-establish the location where the Little River emptied into Catahoula Lake." However, the

25

testimony of the surveyors demonstrated that the meander lines were not retraced on the ground by following in the footsteps of the original surveyor, but rather were mathematically calculated in an office using computers.

Hollis Glenn Kent, Jr., attorney and licensed surveyor, former Assistant Attorney General, former Director of State Lands Office, and current Executive Secretary for the Louisiana Professional Engineering and Land Surveying Board which regulates engineers and land surveyors, was admitted as an expert and testified regarding the rules and regulations, minimum standards, and professional rules of conduct governing surveyors. Mr. Kent was also involved in retracing the 31st parallel in the Florida parishes, which around 1800 was the boundary along the flat part of the boot of Louisiana above Bogalusa. Mr. Kent testified that retracement surveys should be done in the field and on the ground. He testified that he reads the above description of the work done in the PAE Proces Verbal to mean that the courses and distances were actually physically tied to section corners, and that "retracement techniques" require that the lines be run physically on the ground.

Mr. Kent further testified regarding the importance of following the footsteps of the original surveyor as much as possible, so that as one moves down the line with his field notes, one finds as much evidence as possible to prove that the original lines and corners are being surveyed. He testified that it is important to look for bearing trees, witness trees, soil types, dig for stumps, locate old mounds, or broken glass or burned charcoal once used as markers in old surveys. He further testified that if a house has been built, one obviously cannot go through it, but one goes around it and tie other markers in and move on down the line. He stated that if that work was not done in a retracement survey, the survey would not meet minimum standards.

Mr. Kent was questioned about numerous specific statutes in evidence, including La.R.S. 37:681 *et seq.*, of Chapter 8, Professional Engineering and Professional Surveying, and various sections of Title 37, regarding professional and occupational standards for professional engineers and land surveyors. He testified that based upon the omissions and misrepresentations reportedly contained in the PAE survey, the work done could fall under the statutory definitions of misconduct, incompetency, and even fraud. Accordingly, where the trial court heard first hand the testimony of the Grant Parish surveyors, and watched them mark their errors on the PAE survey in open court, we must affirm its finding that the PAE survey was not what it purported to be and could not be relied upon to accurately depict rivers and lakes and their interaction with each other in 1869 or now.

In *Safeco Insurance Co. of America v. Chrysler Corp.,* 01-1641, pp. 10-11 (La.App. 3 Cir. 7/31/02), 834 So.2d 1026, 1035, where an electrician identified pine straw as electrical wiring in a photograph, this court articulated the standard for expert testimony and evidence as follows:

> We have adopted the standards set forth by the United States Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), which regulate the admission of "scientific" testimony. In that case, the Supreme Court stated that the gatekeeping function of the trial court requires it to assess, among other things, the "reliability" of the methodology or formulation upon which the expert's opinion is based. The reliability of a non-scientist expert's testimony, when it is not formulated on a scientific research, is still judged using the *Daubert* standard. The Supreme Court has recognized such in *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999). We have also recognized such in *Darbonne v. Wal-Mart Stores, Inc.*, 00-551 (La.App. 3 Cir. 11/2/00), 774 So.2d 1022. Thus, the trial court's gatekeeping obligation applies to testimony based on "technical" and "specialized" knowledge. *Id.* In *Kumho*, 526 U.S. at 141-42, 119 S.Ct. at 1171, the Supreme Court stated:

> [T]he test of reliability is "flexible," and *Daubert's* list of specific factors neither necessarily nor exclusively applies to all experts or in every case. Rather, the law grants a district court the same broad latitude when it decides *how* to determine reliability as it enjoys in respect to its ultimate reliability determination.
>
> The trial court's inquiry must be tied to the facts of the particular case. *Id.* The abuse of discretion standard applies to the trial court's ultimate conclusion as to whether to exclude expert witness testimony *and to the trial court's decisions as to how to determine reliability. Id.*
>
> In this particular case, the proposed expert testified that he identified four photographs as representative of other causes of the fire. He proclaimed that one such cause was an electrical short emanating from the kitchen. However, he identified pine straw in the photograph as the electrical component that shorted out. Clearly, the factual basis for Mahl's testimony, that the fire did not originate in the van, was called into question. While it is true that it is the trial court's prerogative to allow the jury to weigh the witness's testimony, in light of a misidentification of electrical wiring, such a blatant misidentification, which the defendants refer to as a "mistake," does not only address the credibility of the witness, but the very foundation for the testimony his proponent seeks to enter into evidence. Since the cause and origin of the fire is the central issue of this case, we cannot say the trial court abused its vast discretion in excluding this witness as unreliable.

*Safeco Ins. Co. of America,* 834 So.2d at 1035-36 (alterations in original).

Similarly, in the present case, where the survey is offered to show where one body of water met another body of water in 1869, and the proper methodology for such a survey was not followed, and the survey is not what it purports to be, the trial court did not abuse its discretion in excluding that evidence as unreliable based upon the methodology employed by Grant Parish's surveyors.

Nor can we give credence to the argument by Grant Parish that the survey, which failed to meet the minimum standards requirements for surveys, should

have been admitted for the limited purpose of proving legislative intent. We fail to see how a faulty drawing, determined to be misleading and misrepresentative of where major markers are on the ground, can be used to show the location of the markers that the legislature was pointing to in 1869. Where Grant Parish has made the "gooseneck" configuration the central issue in its argument for locating the parish boundary intended by the legislature in 1869, but the gooseneck was not referenced by the legislature in 1869, and the gooseneck was drawn in 1999 using faulty data, the survey cannot be relied upon to show legislative intent. Moreover, the faulty new survey was purportedly based upon an ancient survey created over thirty-one years before the Act of 1869 was drafted, and the trial court found no evidence that the underlying survey was used by the legislature or referenced or connected in any manner to the Act of 1869. In fact, the trial court rejected this premise, which will be specifically addressed in the section below addressing the separate error urged by Grant Parish on the weight given the 1838 GLO survey.

### The GLO Survey of 1838 and the Eastern Terminus

Grant Parish contends that the trial court erred in "failing to give unassailable weight" to the GLO survey,[5] which plots the Little River in the eastern terminus as running in a gooseneck-shaped configuration far out into Catahoula Lake, and in the weight it allotted to state patents of 1897 and 1898 in determining legislative intent in Act 82 of 1869. It is undisputed that the Act of 1869 made no reference to the GLO plat or to maps or surveys of any kind. The evidence indicated that the names of bayous and rivers referenced in Act 82 are spelled differently than

---

[5]The 1838 GLO Survey or Plat is referenced by Grant Parish as the 1842 GLO Survey or Plat, which was the approval date shown on the plat.

those same names were spelled in the GLO plat, and approximately six different GLO plats of varying dates would have to be used to cover the entire description in Act 82.

Grant Parish entered into evidence five land patents purchased by individuals in 1897 and 1898, four of which were issued in Grant Parish, and one of which was issued in Rapides Parish. Four of the patents provide the numbered section locations that they are deemed to occupy, rendering them susceptible to being plotted on a map containing the township and section lines of a parish. Grant Parish attempted at trial to have Rapides Parish surveyor Frank Willis plot the patents on and below the gooseneck structure in the GLO Plat to prove that the State of Louisiana placed those parcels of land south of the existing boundary line and in the vicinity of the GLO Line advocated by Grant Parish.

Mr. Willis adamantly declined, repeatedly protesting that he would not plot the patents because they were shown on the GLO Plat "on the wrong side of the river . . . and out in the bottom of the lake way beyond the meanders." Ultimately, Mr. Willis marked the map as requested but made it abundantly clear throughout his testimony that the map was inaccurate, unreliable, and below minimum standards. Additionally, we note that the record and various cited cases herein reveal that the issuance and recordation of patents and property assessment was a somewhat loose science in the 1800's and early 1900's. While Grant Parish argues that the GLO survey is sacrosanct, the evidence proves otherwise.

Even without the benefit of the professional surveyors and numerous experts who analyzed this 1838 GLO Plat, the court notes that the plat itself appears to have been compiled from the surveys of four previous surveyors who each in turn surveyed separate geographical portions of the map in separate years: the north boundary by Lawson in 1813; the south, east and part of west boundaries by DeFrance in 1814; four northern miles of west boundary by Kenneth McGrummen

30

in 1824, and the south, east and part of west boundaries by Walker in 1837-38. Therefore, the map appears to be a composite of work done by four surveyors over a twenty-five year period that began fifty-six years before Grant Parish was created. The map was completed thirty-one years before Grant Parish was created and was approved twenty-seven years before Grant Parish was created.

We have detailed the inaccuracies in the GLO Plat previously outlined by Mr. Willis in the section on legislative intent. Mr. Willis further testified that the GLO surveyor did the work in the field using a survey compass on a tripod, and made field notes as he took measurements. Then a draftsman at some later time would then draw the map based upon the field notes of the surveyor. Mr. Willis explained the adjustments that were required in using such a compass:

> And little known by most people is this magnetic north is not true north, it varies from year to year, from day to day. It even varies during the day, we call that diurnal variation. . . . Right now north is about 4° off to the east of where true north is. So there is a little adjustment knob. The surveyor was supposed to, sometimes they apparently didn't, but they're supposed to look at Polaris, which is the north star, and get this thing oriented and get to where when he's reading magnetic north it gives him an adjusted reading which converts it to true north. But Polaris is moving in a circle up in the sky counterclockwise and if you don't hit it at the right time, you're not looking north then either. . . . and you get errors like that and those errors . . . reflect the type of natural or instrumental or personal errors that can go on during a survey even by the most competent of GLO surveyors. . . . When the General Land Office surveyor says that he is running north 99.99% of the time, he's running at what he thinks is about the best he can do to get north and that deviation can be substantial. I've seen it – the most he could get here would be 6 inches in 300 feet, so that's the precision . . . [a]nd if it changes during the day or if he gets off a little bit or if this screw gets loose, there's no telling what's going to happen and that is why it is so important to understand the premise of doing a retracement survey by following the footsteps of the old surveyor . . . as I mentioned . . . [t]he survey is what's on the ground. . . . [t]here's only so much you can do with this thing.

31

Mr. Willis further stated that a hic-cup or a loose screw could cause serious survey errors when using the antique equipment of that era. Accordingly, the reliability of the GLO Plat itself is questionable, particularly under the circumstances of this case. The court, in *Texas International Petroleum v. Delacroix Corp.*, 94-1426 (La.App. 4 Cir. 1/31/95), 650 So.2d 815, *writ denied*, 95-0467 (La. 4/21/95), 653 So.2d 567, determined that the reliability of a GLO plat which is unsupported by any effort to retrace the lines on the ground is questionable at best.

### *The Boundary Description as "Indefinite"*

Grant Parish contends, in only one brief paragraph of argument, that the trial court erred in failing to give credence to Grant Parish's evidence that the boundary was uncertain prior to Grant Parish's institution of proceedings in 1997 under La.R.S. 50:221, *et seq*. We disagree. The only evidence presented by Grant Parish on this issue was the deposition testimony of former Rapides Parish Tax Assessor, Charles Slay, and the very brief trial testimony of Grant Parish Sheriff L. R. Hataway. The trial court discussed that testimony and weighed it accordingly.

As a threshold matter, this assertion is based on the fact that some but not all USGS quadrangle maps contain the word "indefinite" printed along the boundary line between the parishes. However, the trial court noted the testimony of Frank Willis who testified that the USGS places the word "indefinite" on the quad sheets when it is not positive of the placement of the line because the line does not follow section lines or other precise markers identified by USGS cartographers. Perhaps this is because, as noted, the parish line was always rendered as a diagonal line connecting two points, rather than a line that was plotted on the ground from section to section, while moving through the parish west to east. In any event, Mr. Willis testified that "indefinite" does not indicate "disputed" and stated that the word

"indefinite" appears on many parish boundaries that are not contested or disputed. In his survey report, Mr. Willis stated that no quad sheets were found labeling the boundary line as disputed. Mr. Willis testified that the term "indefinite" is used throughout the United States by the USGS on various lines between political subdivisions and that the term is not used to indicate the validity of a line. In explaining this, the trial court reiterated that there was no evidence of a boundary dispute between the parishes until 1997.

The trial court discussed the only testimony presented by Grant Parish regarding an uncertain boundary, the deposition of Charles Slay, and the trial testimony of Sheriff Hataway. Sheriff Hataway was the only live witness to testify at the trial on behalf of Grant Parish. Sheriff Hataway, who took office as Grant Parish Sheriff in 1976, testified that he was aware of criminal jurisdiction issues arising from an uncertain parish boundary, and seemed to recall a discussion "sometimes in the early 80's," but he could not recall a specific incident and did not remember personally investigating crimes on any side of the line. He did not testify to any disputes regarding the parish line.

Grant Parish argues that the deposition testimony of Charles Slay, former Rapides Parish Tax Assessor, indicates that the line was uncertain. However, Mr. Slay's testimony was somewhat self-contradictory. It is true that Mr. Slay, who was seventy-four years old when he retired from the Assessor's Office in 1995, testified in 2002 that the line had been indefinite. Yet, he testified that there was little confusion and no dispute. He also testified that Rapides Parish had the best map system in the state, and spoke very highly of Mr. Luke L'Heureux deputy tax assessor for Rapides Parish since 1973, whom Mr. Slay complimented stating that he drew very good assessment maps and posted property exchanges almost daily. Mr. Slay also testified that he was on the constitutional committee when Article 6, Section 1,

33

was enacted ratifying all parish boundaries in existence as of 1974. He stated that he did not see a problem with the amendment, nor did anyone else. Mr. Slay further testified that by "gentleman's agreement" the Grant and Rapides assessors moved property around without any dispute for assessment purposes, based on where they thought the property should be assessed or based upon where the property owner wanted it to be assessed. He stated that they did not argue with the property owners and "we never had any disputes, between me and Grant."

He admitted that they did not follow the law and did not take the time or have the resources to straighten out the discrepancies when a property south of a Rapides property was assessed in Grant Parish and vice versa. Mr. Slay was and is a property owner and admitted to having great discretion assessing his property where he felt it should be. Throughout his entire deposition, he rarely made reference to a map. When pressed, Mr. Slay referred to the map he used as "a U.S. geological thing." He also admitted to having never looked at the assessment maps for Grant Parish. His stories were very colorful but told of uncertainties created by the less than scientific methods practiced in the assessors' offices, rather than by a line on a map.

The trial court stated that the testimony of Mr. Slay "does not square with the testimony of Ralph Gill and Luke L'Heureux," who are the current assessor and deputy assessor, respectively, for Rapides Parish, and whose testimony appears in the analysis below of the "Line of Acceptance." Both of these gentlemen testified that they had always used and relied upon the line depicted in the USGS Quadrangle Maps or the "Line of Acceptance" without dispute. Accordingly, the trial court gave no weight to the two Grant Parish witnesses on this issue. The trial court was present for all testimony and was in the best position to weigh that testimony. With only the Slay deposition and Sheriff Hataway's testimony, there was a paucity of evidence in support of the position that the line was uncertain and indefinite.

34

On appeal, in its one brief paragraph of argument in support of its contention that the parish boundary was uncertain, Grant Parish also argues that three witnesses for the Town of Ball—Mr. Lawrence L. Mahoney, Mr. Clyde L. Moore, and Mr. Richard Troyce Robertson—confirmed the movement of highway signs showing the parish boundary. However, Grant Parish misrepresents the testimony of these witnesses. All three of these long-time residents and property owners in Rapides Parish testified that the signs were previously moved back and forth over the years as a result of the highway department doing work on U.S. Highway 165, including the four-laning of that highway, and not because the line was uncertain or in dispute.

The only other evidence presented by Grant Parish on this issue is the 1954 case of *Roy O. Martin Lumber Co. v. Baird*, 225 La. 14, 71 So.2d 865 (1954), where the Louisiana Supreme Court stated, "According to the parish surveyor of Rapides Parish, the location of the line between these two parishes is indefinite throughout its entire length because it is impossible to determine the point where Little River ceases to be a river and becomes Catahoula Lake." Grant Parish is quick to point out that the date of the case is 1954, "<u>after</u> the 1946 Grant and Rapides Police Jury resolutions relied upon by the court as 'accepting' a boundary line." However, we note that the *Baird* case was decided <u>*before*</u> the enactment of the 1974 Louisiana Constitution which ratified all existing parish boundaries, and which is the specific date used by the trial court as the date the common boundary was "established." It is true that the court gave great weight to the parish resolutions, but the court did not *rely* on the 1946 resolutions in its ruling.

Moreover, the *Baird* court stated in 1954 that "we think that the line in the instant case is in dispute *within the meaning of the statute*" in reference to La.R.S. 47:1952 which governed only tax assessment issues. *Id.* at 868 (emphasis added).

35

More specifically, the court in *Baird* was not called upon to resolve a boundary dispute between parishes, but rather *Baird* involved private property that was assessed in both Rapides and Grant parishes, and a patent that was recorded in both parishes. The focus in *Baird* was in applying La.R.S. 47:1952 to determine where the property must be assessed and whether a tax sale of that property by the sheriff was valid in Grant Parish. Therefore, the statements of the court in *Baird* must not be broadly construed or expanded beyond the context intended by the court.

Additionally, it is important to note that in spite of the litigation in *Baird* in 1954, and that court's reference to La.R.S. 50:221 setting forth the extrajudicial procedure for a conjoint survey, Grant Parish made no move to invoke the statute and have the boundary surveyed at that time. One must ask the rhetorical question: *Was this perhaps because both parishes had resolved the issue by joint resolutions in 1946, without survey or court intervention, but rather in reliance upon the line drawn in the official maps they referenced in their own resolutions?* In spite of the assertions made by Grant Parish, the *Baird* case does not provide evidence that there was a dispute between the parishes over the boundary line prior to 1997.

The absence of evidence on this issue is amplified by the fact that Grant Parish failed to present testimony from any of its own tax assessors, registrars of voters, school board members, planning commissions, or other parish officials, other than the abbreviated testimony of Sheriff Hataway. Given the weaknesses in the testimony of Charles Slay and Sheriff Hataway, and the overwhelming evidence of an accepted, certified, and ratified line depicted on government issued maps and used and relied upon for sixty years by all entities, we cannot find error on the part of the trial court in its rebuffing Grant Parish's argument on indefiniteness of the boundary.

**The USGS Quad Sheet Line a/k/a Certified Line a/k/a Ratified Line a/k/a "Line of Acceptance"**

Grant Parish contends that the trial court erred in adopting the "Line of Acceptance" theory in fixing the boundary line between Grant Parish and Rapides Parish. Grant Parish argues that the fixing of a parish boundary is governed exclusively by La.R.S. 50:221 and the legislative intent of the Act of 1869. It seeks to completely discount the myriad of historical events taking place over the last 135 years; it misrepresents the applicability of La.R.S. 50:221; it ignores its own official resolutions and certifications; and, it ignores the specific provisions of the Louisiana Constitution of 1974.

More specifically, La.R.S. 50:221, as the trial court articulated, is a procedural statute to be used by the parishes to jointly survey a line before resorting to the courts for a judicial fixing of a disputed boundary line. The statute provides:

> Whenever the governing authority of any parish desires to ascertain and fix the boundary line of any adjoining parish, it shall pass an ordinance to that effect fixing a time and place for starting the running of the boundary. It shall then serve the presiding officer of the governing authority of the adjoining parish with a copy of the ordinance and with notice, at least six months in advance, of the time and place of starting the running of the boundary.

> The surveyors appointed for that purpose, or, if there were none specifically appointed, the parish surveyors of both parishes shall, at the time fixed, proceed to the running and marking of the boundary line. If the surveyor of either parish fails to attend at the time and place fixed, the other surveyor shall wait two days and if the first does not arrive within that time shall proceed to the running and marking of the boundary line.

As the trial court noted, this statute does not prohibit the parishes from entering into an agreement as to the interpretation of an existing boundary. Nor does the statute prohibit the parishes from certifying a boundary line drawn on an existing map without requiring a conjoint survey on the ground. This statute, which derives

from prior laws from the 1800's, has few cases interpreting it, and most of those cases were decided between 1900 and the 1950's, prior to the Constitutional Convention of 1973, which specifically addressed parish boundaries. As the trial court observed, the notes following La.R.S. 50:221 cross-reference La.Civ.Code art. 789, which provides that as to private landowners, the parties may fix their common boundary by written agreement.

As to the statute's exclusive remedy, the Louisiana Supreme Court has made it clear that invoking La.R.S. 50:221 (and its predecessor, 1855 La.Acts 40, and then Section 2624 of the Revised Statutes of 1870) was a condition precedent to seeking relief from the courts in parish boundary disputes, and that the remedy was exclusive only to the extent that the procedure must first be resorted to before recourse can be had in the courts:

> We have consistently held that, where the boundary lines of adjoining parishes have been previously defined by statute, though never established by actual survey on the ground, and where issue arose between two parishes as to the true location of the boundary, the provisions of Act 40 of 1855 were all-exclusive *to the extent that the procedure outlined therein must first be resorted to and be exhausted as a remedy before recourse can be had in the courts.* Parish of Caddo v. Parish of De Soto, 114 La. 366, 38 So. 273; Parish of Caddo v. Parish of De Soto, 119 La. 120, 43 So. 978; Parish of Red River v. Parish of De Soto, 119 La. 992, 44 So. 822; Parish of Caddo v. Parish of Bossier, 164 La. 378, 113 So. 882; Parish of Lafourche v. Parish of Jefferson, 206 La. 615, 19 So.2d 328; St. Martin Parish Police Jury v. Iberville Police Jury, 212 La. 886, 33 So.2d 671.

*Comegys v. Stanolind Oil & Gas Co.*, 227 La. 657, 673, 80 So.2d 110, 115 (1955) (emphasis added).

In the present case, Grant Parish appears to have used the statute to *create* a dispute where none existed before. Notwithstanding, Grant Parish invoked the statute; Rapides Parish surveyor Frank Willis appeared at the time and place

designated to commence the surveying effort; survey methodology disputes arose, and a conjoint survey was not possible. Accordingly, the matter is now properly before the courts. *See Parish of LaFourche v. Parish of Jefferson*, 206 La. 15, 19 So.2d 328 (1944) (regarding sufficient compliance with statute notwithstanding disagreement making it impossible to proceed with joint survey).

Grant Parish further argues that the Louisiana Supreme Court in *Baird*, 225 La. at 19, 71 So.2d at 867-68, "directed the parishes to follow the procedures of La.R.S. 50:221 as the exclusive method which could be utilized to establish the parish boundary" because of the following quote:

> We are not called upon in the instant case to determine the location on the ground of the boundary line between the Parishes of Grant and Rapides. **The ascertaining and fixing on the ground of such a boundary can <u>only</u> be done by the parishes involved pursuant to R.S. 50:221 et seq.** (Emphasis added by Grant Parish.)

Again, we disagree with the argument of Grant Parish regarding the absolute exclusivity of La.R.S. 50:221, and we believe that Grant Parish has taken the *Baird* quotation out of context and made giant leaps in interpreting the words and expanding the intent of our supreme court. As previously noted, the *Baird* case involved private property that was assessed in both Rapides and Grant parishes, and a patent that was recorded in both parishes. The court in *Baird* was governed by La.R.S. 47:1952 in determining where the property must be assessed and whether a tax sale of that property was valid in Grant Parish. We believe that the above-quoted material was stated in a different context and with different emphasis than that asserted by Grant Parish. Because *Baird* did not involve an application to the court to settle a parish boundary dispute, and because the supreme court cases hold the statute to be only a condition precedent to seeking relief from the court, rather than an exclusive remedy, we believe the emphasis should read: *The <u>ascertaining and</u>*

*fixing on the ground* of such boundary can only be done *by the parishes involved*

*pursuant to La.R.S. 50:221.* An examination of the history of La.R.S. 50:221 reveals

that it was important to the courts to distinguish between the statutes designated to

govern a private individual's right, as opposed to a public body's right, to effect

boundary definitions. *See Comegys*, 227 La. 657, 80 So.2d 110.

Grant Parish cannot interpret individual cases from another era, in

isolation, in order to extract a self-serving meaning from each without synthesizing

the surrounding cases relating to the same statute or its derivative. Moreover, we note

again the importance of the fact that most, if not all, of the cases interpreting La.R.S.

50:221 *predate* the Louisiana State Constitution of 1974, which specifically addresses

the ratification of parish boundaries. We first turn to a discussion of the parish

resolutions of 1946 because the trial court analyzed them carefully and in great detail,

in pertinent part as follows:

> The uncontradicted evidence introduced at trial established that on May 11, 1946, the Grant Parish Police Jury unanimously passed a resolution certifying the boundary of Grant Parish as portrayed on Louisiana Department of Highway Maps. Three days later, the Rapides Parish Police Jury unanimously passed a similar resolution. The maps certified by these resolutions are the same as the boundary line known as the "Line of Acceptance" within reasonable cartographic standards.
>
> This line of boundary shown on the Louisiana Department of Highway maps referenced in the resolutions coincides with the U.S. Government Quadrangle maps that show the parish boundary and is northerly of the line described in Act 82 of 1869. (Willis report).

The trial court then inserted in its opinion the actual texts scanned from

the two resolutions. The Grant Parish Police Jury Resolution of May 11, 1946, states

in pertinent part:

> A letter from Mr. D.Y. Smith, Director of Highways was read to the Jury regarding the Parish and Ward lines. The Jury certified as to the correctness of the Parish lines as

shown on the map but corrected the Ward lines between [sic] Wards two and Eight. . . . All the other Ward lines being correct as outlined on the map. On motion Mr. Brown seconded by Mr. G.A. Fletcher and unanimously carried that the Secretary make the proper correction on the map furnished by the Highway Department, Notify the Director of Highways and certify the correct lines and return the mapd [sic] to the Department of Highways, Baton Rouge, Louisiana.

The trial court then noted that the certification of the parish boundary was unanimous, and that there was no discussion or debate reflecting a boundary dispute with Rapides Parish. Three days later, on May 14, 1946, Rapides Parish passed a resolution which states in pertinent part:

Be it resolved by the Rapides Parish Police jury in regular session locally convened that the Parish lines and Ward lines as shown on maps of the Department of Highways, a copy of which was checked by the Rapides Parish Police jury, be and the same is hereby declared established.

Roll call on the above was as follows:

Yeas: Messrs, James, Gremellion, Harris, Rush, Ward, Boyd, Johnson, Brown, Sasser, Atee, Daniel.

Nays: None. The resolution was declared adopted.

Again the court noted that the resolution was unanimously passed and that there was no discussion to indicate that there was a dispute regarding the parish boundary line. The court then discussed the creation of the Grant Parish Planning Board and the Rapides Parish Planning Board the following year in 1947. Both Boards compiled their works on future development into similar books, and both books contained maps. Additionally, the record indicates that both Boards submitted identical letters of transmittal to Dewitt L. Pyburne at the Louisiana Department of Public Works, indicating that the parishes were working together on this project. The record further indicates that the survey by the Rapides Parish Planning Board included two official maps of Rapides Parish which reflect the same boundary line

41

submitted by the Grant Parish Board and established by both police jury resolutions in 1946, which is the same boundary depicted on all official maps since that time.

The trial court concluded that the evidence presented at trial overwhelmingly established that the boundary line depicted by Frank Willis as the "Line of Acceptance" had been recognized and accepted by the governing authorities of both parishes as well as by local, state and federal officials and entities and the citizens of both parishes for more than fifty years.

Mr. Lawrence Mahoney, who was the first mayor of the Town of Ball, testified that he had married Florence Robertson, whose family owned land along the boundary, that he had lived in the area for thirty five years, and that the parish line was located at the north end of the Troyce Robertson property. Mr. Mahoney stated that when he chaired the meetings to incorporate the Town of Ball, they used the "accepted parish line" as the northern boundary of the Town of Ball. The evidence presented at trial supports this testimony in the form of a Proclamation signed by Governor John McKeithen on May 1, 1972, incorporating the town of Ball. The Proclamation contains a legal description which has as its starting point and its ending point, "the boundary between Rapides Parish and Grant Parish."

As Mr. Mahoney testified, the northern boundary of the Town of Ball runs along the boundary between Rapides and Grant Parish. Mr. Mahoney stated that they could not afford to have the boundaries surveyed but did hire an engineering firm to draw up the legal description for the boundaries. The only problem he recalled was a complaint by Troyce Robertson regarding the movement of the parish sign a few feet south by the Highway Department while working on U.S. Highway 165 in the 1970's.

Likewise, Mr. Mahoney's wife, Mrs. Florence Robertson Mahoney, testified that she was born in Alexandria in 1936, that she lived at 7005 Monroe

42

Highway just south of her father's house, which was just south of where she had always known the parish line to be, and just north of the Bringhurst line. Mrs. Mahoney also testified that she had deeds and documents from her grandparents, Ransom White Robertson and Amanda Delilah Robertson, from the 1800's showing her property in Rapides Parish. She further stated that the highway sign as far back as she could remember was located on the right hand side of the road right at the north edge of Troyce Robertson's yard, and that Troyce Robertson's estate was next to her father's land on the north, between her property and the "accepted line." She further testified that their children always attended school in Rapides Parish, they always voted in Rapides Parish, and she had her grandfather's homestead exemption receipts from Rapides Parish from around 1904, 1905.

Mr. Clyde Moore, who was born in the settlement of Ball in 1938, was the chief of police and then mayor of the Town of Ball, testified that he was raised and still lives on the road that is the eastern boundary of Ball city limits and located approximately one-and-one-half miles from the currently recognized or accepted boundary line. Mr. Moore testified that his father was a school bus driver for twenty-nine years beginning in 1951 and that he always turned the bus around on Highway 165 at the Grant Parish Line at Ms. Lottie Robertson's store. Mr. Moore testified that as chief of police for thirteen years and then Mayor of the Town of Ball, he had exercised jurisdiction up to the accepted boundary line, which also determined the voting precinct for Ball during his tenure. Mr. Moore testified that the parish sign had been played with a little when Highway 165 was being four-laned but it was moved back and has always been in the vicinity of where Miss Lottie Robertson's store was located.

Mr. Rick Robertson, son of Troyce Robertson, testified that he was forty years old, had moved back home in 1997, and had lived at the family address at 7094

Monroe Road, Pineville, for about thirty years. He testified that the Robertson estate is a pie-shaped piece of land that borders the current accepted line between the parishes. He stated that he lives and votes and has homestead exemption in Rapides Parish, and that the mortgage was recorded and paid off in Rapides Parish. Mr. Robertson testified that the northern tip of the family property almost touches the accepted boundary. After his father died in 1997 and he moved home to handle the succession, he learned that the parish sign had been moved about twenty-five feet south of his driveway and that he could not get his mail in the family mail box on the highway. He looked at an old survey from around 1964 that showed the parish line as the accepted line, and he was told to put in a request, and the DOTD would come out and put the signs back (on the accepted line).

Mr. Robertson stated that he watched from his porch while the signs were pulled up and placed where they had always been when he was growing up. He stated that there were two signs on each side of the highway, with Ball and Rapides Parish signs on one side, and Pollock and Grant Parish signs on the other. He further stated that when he was a child, the highway consisted of two lanes, and the signs got moved four or five feet every time highway work was done. Mr. Robertson then testified that two days after the signs were moved back to their old location, Grant Parish and Pollock people came and moved the signs again. Then Rapides Parish came, and there was movement back and forth until he saw the signs go "north" and stay gone for about six months. Apparently this was the beginning in 1997 of the current controversy. Mr. Robertson stated that the signs are now located on the accepted line where they were when he was growing up. He now gets his mail and "everything is right with the world."

At trial, the Mayor of the Town of Ball since 1987, Mr. Roy Eugene Hebron, who was also an alderman in 1986 and was living in Ball when it was

44

incorporated in 1972, identified on a map exhibit the line of acceptance as surveyed by Mr. Willis as the parish and town boundary used by the Town of Ball since its inception. In fact, Mayor Hebron accompanied Mr. Willis in the field along the entire line of acceptance and identified federal highway project markers on Highway 71, marking the place where the federal projects, which had begun in Tioga and Colfax, were stopped at the parish line. Mayor Hebron called the line the USGS line. Mayor Hebron further testified that the town of Ball provides water, sewerage, fire protection, and 911 medical and fire emergency services, up to the USGS line of acceptance and that there had never been a dispute or claim that the boundary was anything other than the line of acceptance or the USGS line. The Mayor identified an exhibit as depicting Highway 71 and stated: "That is the parish line signs with the monuments also, we took a picture with the parish line and the monuments all being in line."

Mr. Ralph Gill testified by stipulation, stating that he was the current Rapides Parish Tax Assessor, with the Assessor's Office since 1969. He identified map exhibits and stated that he had reviewed the Rapides and Grant Parish plats (as confirmed by the Grant Parish Assessor, Mark Newton) and found them to be identical. Mr. Gill stated that during his entire tenure the line reflected on all Rapides Parish assessment maps and on Grant Parish assessment maps has been undisputed and is the same line as the line depicted on the Willis survey exhibits, "that being the line of common acceptance since 1941 surveyed by Frank Willis." Mr. Gill further testified that during his thirty-four year employment by the Rapides Parish Tax Assessor's Office, he had never been involved in or apprised of a dispute between the Grant Parish and Rapides Parish Assessor's Offices over the location of the line of acceptance. Mr. Gill further testified that should the currently recognized parish line

45

be shifted south to the Bringhurst Line, Rapides Parish would lose approximately 365 residences and approximately 3,000 acres of land.

Lyle Hutchinson, Assistant Superintendent for Curriculum and Instruction with thirty-two years on the Rapides Parish School Board, testified at trial that he wrote the description for Rapides Parish school zones. He identified the maps used by the school board showing the northern boundary as the USGS and accepted boundary line, and stated that it had always been the recognized boundary without dispute in the thirty-two years that he had been with the system. Mr. Hutchinson further identified other maps depicting the same northern boundary and testified that this was the boundary line used by the federal judges in the ongoing Rapides Parish desegregation case since the 1960's, and also by the political election districts and taxing districts.

John C. Miller, Executive Director of the Rapides Parish Area Planning Commission for twenty years at the time of trial, and with an additional five years with the Commission prior to that, testified at trial that he provides planning and technical systems activities for the cities and the Police Jury in Rapides Parish. He stated that he provides maps to these governmental bodies, and to businesses and individuals, prepared by the U.S. Department of Transportation and the U. S. Federal Highway Administration. Mr. Miller identified in court the 1975 base map that he uses that contained the same parish line as the accepted line surveyed by Mr. Willis. Mr. Miller testified that he provides maps showing the same parish boundary line to Acadian Ambulance, Rapides Assessor's Office, U.S. Census Bureau, elected officials and/or candidates, FEMA (Federal Emergency Management Agency), Fire Districts, DOTD, Postal Carriers, Registrar of Voters, Taxing Districts, Sewerage Districts, Sheriff's Office, Forestry Service, 911 Emergency Response

Communication Center, and others including a call-in by a business once a week on average. No one has ever claimed or complained that the boundary was incorrect.

Mr. Charles W. Smith, Jr., born in 1935, former engineering specialist with the highway department, employed in quality control with Pan American Engineers at the time of trial, testified at trial that his property is about a quarter of a mile south of the accepted parish boundary. Mr. Smith stated that he was raised within 1,200 feet of the line and that when he was ten or twelve years old, he helped a surveyor survey his dad's property, and they started at the parish line, which is the current line of acceptance surveyed by Frank Willis for this litigation. Further, Mr. Smith testified that his property has always been assessed in Rapides Parish, he has always voted in Rapides Parish, and his children attended school in Rapides Parish.

Mr. Charles Gintz, born in 1932 and a longtime resident and property owner in Rapides Parish, testified at trial that his property is just south of the USGS line according to his 1941 quadrangle map and according to a white concrete parish marker erected by the railroad. He stated that he was able to show the base of the railroad's parish marker, which still remains, to Mr. Willis during the survey process. Mr. Gintz stated that his property is assessed in Rapides Parish and he votes in Rapides Parish.

Mr. Rocky Wilson, Rapides Parish Assistant District Attorney since 1983, testified by stipulation that his office has always exercised jurisdiction in criminal prosecutions within the territorial boundaries reflected in the official maps of Rapides Parish entered as exhibits by the Town of Ball. He further testified that to his knowledge there had never been a disagreement between the Grant and Rapides Parish District Attorney's Offices regarding the parish boundary line or the prosecutorial jurisdiction.

47

Mr. Wayne Marchand, District Administrator for District 8 of the Louisiana Department of Transportation and Development (DOTD), testified by stipulation that he has been with the Louisiana DOTD since 1972 and that he supervises and oversees District 8 which includes Grant and Rapides Parishes. Mr. Marchand stated that the DOTD uses the official maps of Grant Parish, Rapides Parish, and the State of Louisiana, published by the DOTD, some of which are entered into evidence. He referenced numerous map exhibits which were proved by Frank Willis to reflect the line certified by both parishes in 1946 pursuant to the Louisiana Department of Highway maps. This line coincides with the USGS quadrangle maps, and is the line surveyed by Mr. Willis as the line of acceptance. Mr. Marchand further stated that he was unaware of any problems or disagreements arising from the location of the boundary line reflected on the DOTD maps.

Sheriff William Earl Hilton, with the Rapides Parish Sheriff's Office since 1970, testified by stipulation that jurisdiction was determined by reference to the parish maps available in 1970, that these maps were provided by the State of Louisiana, DOTD, and reflected the line of acceptance/USGS boundary. Sheriff Hilton further stated that he commissioned Fordyce Mapping of Arkansas to prepare a map for Rapides Parish, as entered into evidence, and that map reflects the currently recognized USGS boundary between the two parishes. Sheriff Hilton testified that the Fordyce map is used by the Sheriff's Department for all jurisdictional purposes including but not limited to investigative response to calls, requests for search warrants and arrests. He stated that to his knowledge, the sheriff's offices of Grant and Rapides Parish had never had a disagreement as to the parish boundary or jurisdiction at or near the current boundary.

Mr. Michael T. Johnson is the present attorney for Rapides Parish School Board in the *Valley v. Rapides Parish School Board* desegregation case pending in

the United Stated District Court for the Western District of Louisiana since 1970. He referenced specific maps entered into evidence indicating that the federal court and federal judges have recognized and used the line certified in 1946 as the boundary line between the parishes. Mr. Johnson stated that these maps are used by the judges to determine racial mix, school attendance zones, and bus routes in order to effectuate desegregation in Rapides Parish. Mr. Johnson further stated that to his knowledge there had never been an issue regarding or problem identifying the common boundary in the desegregation case. Mr. Johnson further stated that if the boundary, as currently drawn, is altered, the racial mix and attendance zones already approved by the courts will be adversely impacted.

Ms. Joanell Wilson, Registrar of Voters for Rapides Parish, testified by stipulation that she has been with the Registrar's Office since 1968, that she determines which voters are eligible to vote in Rapides Parish, and that she works closely with the United States Department of Justice in enforcing the federal Voting Rights Act. She stated that in determining voter eligibility, her office uses the Rapides Area Planning Commission map entered into evidence by the Town of Ball. Ms. Wilson stated that prior to the existence of the Planning Commission, older maps were used that reflected the same boundary line between the parishes. She further stated that to her knowledge there has never been a problem, disagreement, or issue regarding voting rights based upon the parish boundary reflected in the maps. This testimony indicates ongoing undisputed use of the line certified by both parishes in 1946 and reflected as the line of acceptance in the Willis Survey.

Command Sergeant Major Roger Corley with the Louisiana Military Department, Louisiana National Guard, testified by stipulation that he was responsible for training activities at the 12,500 acre facility at Camp Beauregard from 1984 until 2002. He identified a map of Camp Beauregard entered into evidence by

49

the Town of Ball as the map he used for jurisdictional purposes in coordinating law enforcement with local and military police. That map also reflects the accepted boundary surveyed by Frank Willis and certified by both parishes in 1946. Command Sergeant Major Corley also stated that to his knowledge there had never been a problem or issue concerning the Louisiana Military Department with the location of the boundary between Grant and Rapides parishes.

Ms. Angie Richmond, Secretary of the Rapides Parish Police Jury since 1981, testified by stipulation that she is the custodian of records, including records regarding mapping and taxation. She identified specific maps entered into evidence and stated that:

> [T]he boundary reflected on the official parish map of Rapides, which I believe to have been certified as correct by the Rapides Parish Police Jury in 1946, has been utilized since that time for all purposes, including, but not limited to providing of parish services, construction and maintenance of parish roadways and right of ways, sales and use tax collection, parish health unit services, flood control and all other services and assessments which fall within the jurisdiction and duties of parish government.

Mr. T. J. Hollingsworth, Chairman of the Board of Water Works District #3 of Rapides Parish, former Chief Deputy and Sheriff of Rapides Parish, one of the founding fathers and former Mayor of the Town of Ball, testified by stipulation that the northern boundary of Water Works District #3 is the current USGS boundary between the parishes. Mr. Hollingsworth stated that since its inception, the USGS line had been used to determine the placement of infrastructure and to determine where the District provided services. He further stated that Pan American Engineering and Mr. Thomas David have been the retained consulting engineers for the Water Works District since Mr. Hollingsworth had been on the Board. He stated that all maps and sketches received from Mr. David reflect the Grant/Rapides line as that depicted on the applicable USGS Quad Sheets. Mr. Hollingsworth referenced

specific map exhibits entered into evidence. Those maps depict the USGS/accepted line and bear the name and seal of the Grant Parish expert surveyor in this litigation, Thomas C. David/Pan American Engineering. Mr. Hollingsworth further stated that there had never been a dispute regarding the boundary between the parishes within the context of the Water Works Districts or the common boundary as it pertained to the Town of Ball.

Mr. Cecil Raggio, Rapides Parish Police Jury Engineer from 1977, Public Works Director and Engineer from 1984 forward, testified by stipulation that for road work, flood control, and other works, he used official Rapides Parish maps in evidence, which reflect the 1946 certified boundary line surveyed by Mr. Willis. Mr. Raggio stated that he had no knowledge of disagreements about the location of the boundary between the public works departments of the respective parishes.

Mr. Chico Maldonado, U.S. Law Enforcement Officer, testified by stipulation that his jurisdiction includes the Kisatchie National Forrest, parts of which are located in both Grant Parish and Rapides Parish. Mr. Maldonado stated that his department is instructed by the U.S. Government to use the most current USGS Quad Sheets to determine whether an incident occurs in Grant Parish or Rapides Parish. He stated that to his knowledge there has never been an issue, dispute, or problem regarding the current location of the boundary as depicted on the maps used by the United States Government.

Mr. Luke L'Heureux, Deputy Tax Assessor for Rapides Parish since 1973, testified by stipulation that his duties include drawing assessment maps. Based upon his review of specific exhibits in evidence, the boundary line reflected by the Rapides Parish Tax Assessor's plats and the Grant Parish Tax Assessor's plats are identical. Mr. L'Heureux further testified that during his entire tenure in the tax assessor's office, the line reflected on all Rapides Parish Tax assessment maps and

on the Grant Parish tax assessor's maps introduced as exhibits is the same line accepted since 1941 and surveyed by Frank Willis in this litigation. Mr. L'Heureux stated that to his knowledge since the 1950's the Rapides Parish Assessor's Office has used the USGS Quad Sheet line as the line of demarcation between Grant and Rapides parishes for tax assessment purposes, and that is the line he uses when drawing new assessment maps. Mr. L'Heureux stated that he has never been aware of a dispute between the two parish assessor's offices regarding the boundary reflected on both parish plats.

Mr. Tommy Smith, born in 1939, testified by stipulation that he had lived since birth within one-half mile of the currently accepted parish line, i.e., the USGS/line of acceptance. He stated that he had been told that his property lies between the line of acceptance and the Bringhurst line, but all his life he had been told and believed and acted in accordance with the USGS boundary as the boundary in fact between the parishes. He stated that he has homestead exemption in Rapides Parish, and has always voted in Rapides Parish, and Rapides Parish has always provided all of his services, assessments, and education. Mr. Smith further stated that there are certain landmarks, including a highway marker on a ten-foot culvert, which is located on the currently accepted boundary line.

Major Mike Slocum, Commander of the Uniformed Division, Rapides Parish Sheriff's Office, with the Department since 1986, testified by stipulation that his jurisdiction was determined by parish maps provided by the State of Louisiana, DOTD, and reflected the line of acceptance/USGS boundary. Major Slocum identified specific exhibits entered into evidence by the Town of Ball, and stated that the boundary reflected on these maps was used for all law enforcement purposes. He also stated that he uses the Fordyce map reflecting the same boundary, and that to his knowledge there has never been a disagreement between the respective sheriff's

offices regarding the current boundary reflected on the Fordyce and parish maps, and that the two offices have a great working relationship.

In conjunction with the above testimony and its submitted brief, the Town of Ball entered sixty-three exhibits into evidence, most of which were maps or bundles of maps showing the currently recognized and accepted boundary line. The Town of Ball also had depositions admitted into evidence, including the depositions of two Grant Parish officials. Mr. Bob McLamore, Grant Parish Superintendent of Schools, admitted that the School Board uses the "official map of Grant Parish" previously identified by Frank Willis as reflecting the currently recognized and accepted boundary. Grant Parish bases its attendance zones and school taxing districts on this line. The deposition of Shirley Chelette, Grant Parish Registrar of Voters, attached an official map used by the Registrar to determine voter eligibility in Grant Parish. This map reflects the boundary certified in 1946 by both parish police juries.

Accordingly, Rapides Parish and the Town of Ball, produced overwhelming testimony that the boundary line shown on the USGS Quadrangle Maps or USGS Quad Sheets was not only certified in 1946 by both parishes via individual resolutions and ratified in 1974 by Constitutional Article 6, Section I, but it was overwhelmingly accepted and relied upon by residents, governments, courts and political entities of every description.

After summarizing the testimony and evidence at trial, the trial court stated that, "[i]t is significant to the Court that until this trial Grant Parish's own engineering firm, Pan American Engineers, has utilized in the preparation of its maps and surveys without exception the line referred to as the 'Line of Acceptance.'"

The court provided a comprehensive and exhaustive analysis of *St. Martin Parish Police Jury v. Iberville Parish Police Jury*, 212 La. 886, 33 So.2d 671

(1947) and found it significant in that the Louisiana Supreme Court did not disregard the evidence of historical recognition of the boundary at issue therein. More specifically, in that case, the court reversed a judgment locating the boundary line as contended by the St. Martin Parish Police Jury, and found in favor of Iberville Parish, who was the defendant therein. In addition to its search for legislative intent, the court considered subsequent events occurring forty to fifty years after the act creating the boundaries. The court discussed numerous maps and surveys and found that all of the maps without exception depicted and conclusively proved, for a period of approximately fifty years, the boundary line between the parishes to be as contended by defendant-appellant, Iberville Parish.

The trial court reviewed the resolutions of 1946 certifying the maps depicting the "Line of Acceptance" and painstakingly analyzed the legal effect of the resolutions and the constitutional amendment. The court concluded that the police juries were acting within the scope of their legitimate powers granted by the state when they both passed resolutions, and that the resolutions are written evidence that the "delimitation" of the common boundary between the parishes had occurred. That is, both parishes agreed to a line drawn on a map, as explained by Dr. Easterly as part of the historical process of establishing a boundary. The trial court found that while the resolutions were not considered ordinances, they were enforced as ordinances. The trial court took judicial notice that parishes passed multiple ordinances based upon the resolutions, such as the ordinances defining the wards of the parishes. The trial court ultimately determined that this was evidence of the intent of the parishes, not to change the boundary but to legitimately control their jurisdictions under what they reasonably believed to be the boundaries of the two parishes.

We also find it noteworthy and likely more than coincidental that in 1946, when both Grant and Rapides parishes certified by unanimous resolutions their

54

existing parish boundaries, the Louisiana legislature was re-enacting a statute that authorized police juries to resurvey and approve their township and sectional lines, which, once approved, became official and conclusive. More specifically, the court in *Comegys*, 80 So.2d at 114, stated:

> The Legislature, in adopting Act 182 of 1912, authorized police juries to resurvey and re-establish range, township and sectional lines and to employ competent surveyors for that purpose, Section 1. It further *required the approval of such surveys by the police juries,* and, *once so approved, became the official surveys* of the township *and was conclusive of its correctness,* unless set aside in a direct action on the ground of fraud or gross error. Section 6. It was thereafter expressly repealed by Act 232 of 1934. . . .
>
> It is interesting to note that in 1946 the Legislature, by Act 340, R.S. 50:151-50:157, substantially re-enacted Act 182 of 1912. The Act of 1946 again vested authority in parish police juries to have surveys and resurveys made as affecting range, township and sectional lines and significantly declared therein that such surveys or resurveys would not affect or be binding upon the parishes, insofar as their respective boundaries were concerned, without the concurrence and participation by the governing authorities of the parishes themselves, R.S. 50:157, section 5b.

(Emphasis added).

As we indicated, it is likely *not coincidental* that both Rapides and Grant Parishes decided to pass resolutions certifying the existing parish boundary as depicted on Louisiana Department of Highway maps instead of invoking the fresh new statute allowing them to resurvey the line. Moreover, in 1947, they again filed their *official* parish maps through their Planning Boards, indicating their *approval*, *conclusiveness* and *correctness*.

The trial court addressed the ratification of the line in the Louisiana Constitution, stating that the Constitutional Convention convened on January 5, 1973, for the purpose of framing a new constitution for the citizens of the State of Louisiana during a special election held on April 20, 1974. The new constitution became

effective at midnight on December 31, 1974. The 1974 Constitution includes the addition of Article 6, Section 1, Subsections (A) and (B) which read as follows:

> (A) Parishes and Boundaries Ratified. Parishes and their boundaries as established on the effective date of this constitution are recognized and ratified.
>
> (B) Creation; Dissolution; Merger; Boundaries. The legislature by law may establish and organize new parishes, dissolve and merge parishes, and change parish boundaries if approved by two-thirds of the electors in each parish affected voting thereon at an election held for that purpose.

The court determined that the parishes had never attempted to change the common boundary by voter approval under Subsection (B). However, the court stated that, "Subsection (A) is clear in its language that parishes and their boundaries as established on the effective date of the Constitution are ratified and recognized." The court further stated that if the common boundary between the parishes was established as of the 1974 effective date of this provision, "then Grant Parish has no basis in the law for its current claims." After determining that the term "establish" was not used as a term of art in this instance with an assigned definition, the court discussed the general definitions assigned by usage, such as, to settle, make or fix firmly, enact permanently, bring into existence, prove, and convince. Ultimately, the court held that "the boundary between Rapides Parish and Grant Parish was "established" on the effective date of the 1974 Constitution. The court noted that following the passage of this provision, Grant Parish remained silent for another 23 years.

The record supports the court's conclusion that the vast majority of maps prepared after 1940 depict the boundary in its current location, and that everyone was in agreement. This is particularly true based upon the usage of the maps by all governmental, commercial and individual entities. Accordingly, the court stated that the result of his ruling in favor of the "Line of Acceptance" would be the same under

an analysis of the facts established at trial under the "Common Error Doctrine," the "Rule of Acquiescence," estoppel, or the equitable considerations urged by Rapides Parish and the Town of Ball.

The Louisiana Supreme Court's most recent expression of the Common Error Doctrine is found in *Comegys*, 227 La. at 673, 80 So.2d at 115, which, as we see, has been instructive in many ways:

> Whenever an issue arose between adjoining parishes over the location of their statutory boundary lines and which had never been defined on the ground; or, where there arose a contest between landowners adjoining said boundary line, due to an uncertainty as to which court should entertain jurisdiction thereof, we have consistently held that the consideration and acceptance of landowners in that area adjoining the boundary line, and that of parish officials and official agencies, including proof of the levying and collection of taxes, was admissible proof, and that the judge before whom the suit has been originally instituted should hear and consider all relevant facts for the purpose of determining the extent of the territorial jurisdiction over which he presides. Our jurisprudence in that respect is founded on the maxim 'L'erreur commune fait le droit'.

In the case of *State v. Malone*, 134 La. 779, 783, 64 So. 711, 713 (1914) (citations omitted), the court held:

> A question of boundary is the same whether raised in a criminal or civil suit. Where the boundary between two parishes has never been surveyed and established by a conjoint survey as provided by section 2624 of the Revised Statutes of 1870, and a certain section had been treated by the parochial authorities and the owners as lying wholly in one of the parishes, this court applied the maxim, 'Communis error feeit jus.'

*State v. Texas Co.*, 211 La. 326, 341, 30 So.2d 107, 112 (1947):

> It is the well-established law of this State that, where a boundary between two parishes has never been surveyed and established by conjoint survey and a certain section has been treated by parochial authorities and the owners as lying wholly within one of the parishes, the Court will apply the maxim 'L'erreur commune fait le droit'.

While, the "Common Error Doctrine" does not appear to have been specifically applied to settle a boundary dispute between two parishes, it is reasonable to assume that the same proof used by the courts to determine boundaries where there is no joint survey, cannot then be ignored when the parishes have exhausted joint survey efforts and apply to the courts for relief. There still is no joint survey. The controversy is now in the province of the court, and the court is compelled to consider all applicable law available to it in rendering a just decision.

The trial court stated that the federal "Rule of Acquiescence" is almost identical to the "Common Error Doctrine." Following an analysis of *Louisiana v. Mississippi*, 202 U.S., 53-54, 26 S.Ct. 408, 423 (1906) (citations omitted), which held that as to boundary controversies between the states:

> [L]ong acquiescence in the assertion of a particular boundary and the exercise of dominion and sovereignty over the territory within it, should be accepted as conclusive whatever the international rule might be in respect to the acquisition by prescription of large tracts of country claimed by both.

The trial court then reasoned that an application of this rule of law would result in a finding that Rapides Parish had asserted long and continuous jurisdiction and authority with regard to the "Line of Acceptance," and that Grant Parish had acquiesced in that jurisdiction.

Although the court did not analyze in depth the principles of equitable estoppel urged by Rapides Parish and the Town of Ball, the court embraced the argument and outlined briefly the disruption that would occur in the operation of local, parish, state and federal government, in industry, and in the lives of children, taxpayers, voters, and homeowners, if the long accepted boundary were relocated. Moreover, such movement of the boundary would create chaos in mortgage records, criminal prosecutions, adversely impact pending cases such as the thirty year old

federal desegregation case, and would open the floodgates of litigation for years to come. The court further stated that jurisprudence suggests that Grant Parish would have to reimburse Rapides Parish for roads, bridges, schools, and other improvements.

The Town of Ball argues that the delegates to the Louisiana Constitutional Convention, in enacting Article 6, Section 1, "recognized that modern-day tinkering with established boundary lines would have costly and ill-advised ramifications." We agree. Moreover, the 1946 resolutions passed unanimously by Grant Parish and Rapides Parishes, within days of each other, clearly approved and certified the parish boundary lines as shown on Louisiana Department Highway maps, and constituted positive official action much more convincing than any doctrine of acquiescence. The resolutions are particularly persuasive in light of the statutes available to the parishes at the time to resurvey and establish parish boundary lines, and the fact that neither chose to do so. Accordingly, we find no error in the trial court's decision to establish the boundary according to the USGS Quad Sheet Line, a/k/a, the "Line of Acceptance."

**Assessment of Costs**

Grant Parish asserts that it was error for the trial court to assess all court costs in this matter against Grant Parish, including approximately $470,000.00 in expenses related to Rapides Parish expert witnesses. Rapides Parish argues that the law clearly provides the trial court with discretion to cast the losing party with costs, including expert fees. We agree and find no abuse of discretion in the assessment of costs.

## CONCLUSION

Based upon the foregoing reasons, we affirm the judgments and rulings of the trial court. A reversal in this complex boundary dispute would require an impermissible substitution of our judgment for that of the trial court, there being no manifest error. Costs of this appeal are assessed to Grant Parish.

**AFFIRMED.**