STATE OF LOUISIANA
COURT OF APPEAL, THIRD CIRCUIT

15-637

LAFAYETTE CITY-PARISH CONSOLIDATED GOVERNMENT

VERSUS

VERMILION PARISH POLICE JURY

CONSOLIDATED WITH 15-638

VERMILION PARISH POLICE JURY

VERSUS

LAFAYETTE CITY-PARISH CONSOLIDATED GOVERNMENT

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF LAFAYETTE, NO. C-20141994 C/W PARISH OF VERMILION
99096
HONORABLE JOHN D. TRAHAN, DISTRICT JUDGE

**********

JIMMIE C. PETERS
JUDGE

**********

Court composed of Sylvia R. Cooks, Jimmie C. Peters, and Marc T. Amy, Judges.

AFFIRMED.

**Gary McGoffin**
**Jonathan R. Villien**
**Durio, McGoffin, Stagg & Ackermann, P.C.**
**P. O. Box 51308**
**Lafayette, LA 70505**
**(337) 233-0300**
**COUNSEL FOR PLAINTIFF/DEFENDANT/APPELLANT:**
     **Lafayette City-Parish Consolidated Government**

**Paul G. Moresi, III**
**Assistant District Attorney**
**P. O. Box 1140**
**Abbeville, LA 70511-1140**
**(337) 898-0111**
**COUNSEL FOR DEFENDANT/PLAINTIFF/APPELLEE:**
     **Vermilion Parish Police Jury**

**PETERS, J.**

The issue in these consolidated suits is the location of the boundary line separating Lafayette and Vermilion Parishes. The litigation is now before this court because the Lafayette City-Parish Consolidated Government (Lafayette City-Parish) appeals a trial court judgment which granted an exception of prescription filed by the Vermilion Parish Police Jury (Vermilion Police Jury), rendered a declaratory judgment in favor of the Vermilion Police Jury, and rejected a reconventional demand filed by the Lafayette City-Parish. For the following reasons, we affirm the trial court judgment in all respects.

## DISCUSSION OF THE RECORD

In 1844, the Louisiana legislature carved Vermilion Parish from what was then Lafayette Parish by the passage of 1844 La. Acts No. 81. Unfortunately, with regard to the boundary line between the two parishes, the enabling legislation referenced then-standing timber as boundary landmarks; and as time passed, those landmarks disappeared. This lack of historically referenced landmarks caused the exact boundary between the two parishes to remain unsettled until 2002 when the Lafayette City-Parish[1] and the Vermilion Police Jury joined together in an effort to firmly identify the boundary. Pursuant to the authority set forth in the ordinances enacted by both governing bodies, each executed a Joint Cooperative Endeavor Agreement and Intergovernmental Agreement (Intergovernmental Agreement) in the spring of 2002.[2]

Pursuant to the terms of the ordinances and the Intergovernmental

---

[1] By this time, Lafayette Parish had adopted the City-Parish form of government.

[2] The Lafayette City-Parish enacted its enabling ordinance on April 16, 2002, and the Vermillion Police Jury did the same on May 6, 2002. On April 19, 2002, the Lafayette City-Parish executed the Intergovernmental Agreement, and the Vermillion Police Jury did the same on May 6, 2002, the same day it enacted the enabling ordinance.

Agreement, the governing bodies of each parish designated the State of Louisiana, Division of Administration, State Land Office (State Land Office), to perform the research and field surveys necessary to accurately identify the boundary between the two parishes. The Intergovernmental Agreement specifically stated that the parties agreed that the purpose of the Intergovernmental Agreement was not to "change or alter the location of any existing boundary between Lafayette Parish and Vermilion Parish, but rather to re-establish the location of portions of the parish boundary" and that the two political subdivisions "agreed to accept the findings of the State Land Office's survey" as well as to share the costs of the survey.

On August 13, 2003, the State Land Office completed its boundary report, and based on the findings in that report, the Lafayette City-Parish and the Vermilion Police Jury enacted ordinances wherein the language of both asserted that the State Land Office had "satisfactorily completed the surveys and re-establishment of the common boundary" and that each parish had "reviewed the data furnished by the State and is in agreement with their findings[.]"[3]

The source of the current litigation is an October 1, 2013 effort by the Lafayette City-Parish to repeal the prior ordinances authorizing and accepting the State Land Office's findings. This came in the form of a new ordinance[4] which stated in part that the State Land Office's "survey and Final Report are erroneous in several respects, including, but not limited to, the failure to utilize all available information and data in order to reach accurate conclusions about the location of the common boundary[.]" On October 7, 2013, the Vermilion Police Jury

---

[3] On November 17, 2003, the Vermilion Police Jury enacted Ordinance No. 2003-O-21 and on January 22, 2004, the Lafayette City-Parish's Ordinance No. O-307-2003 became effective.

[4] This ordinance was designated as Ordinance No. O-220-2013.

2

responded by enacting an ordinance of its own[5] which states in part that "Vermilion has not agreed to rescind or invalidate the [Intergovernmental Agreement][.]" The ordinance further "respectfully requested" the Lafayette City-Parish "to honor the agreements set forth in the [Intergovernmental Agreement] and to refrain from any action which would violate the legal obligations set forth" in the Intergovernmental Agreement. The Lafayette City-Parish ignored this request. Instead, on April 23, 2014, it passed an ordinance fixing the time and place it intended to begin a new survey "in accordance with the pertinent provisions of La.R.S. 50:221."[6]

On April 21, 2014, the Lafayette City-Parish filed a petition in Lafayette Parish requesting that the President of the Vermilion Parish Police Jury be served with notice of its intent to run the boundary between the two parishes in accordance with the ordinance which would be passed two days later.[7] On August 7, 2014, the Vermilion Police Jury responded by filing a petition in Vermilion Parish against the Lafayette City-Parish wherein it sought a judgment "declaring the rights of the parties under the [Intergovernmental Agreement], and specifically finding that said [Intergovernmental Agreement] is binding on the parties[.]" The Lafayette City-Parish answered this petition, and on November 6, 2014, both matters were consolidated for trial in Vermilion Parish by joint motion of the parties.[8] After the matters were consolidated, the Lafayette City-Parish filed

---

[5] This resolution was designated as Resolution No. 2013-R-18.

[6] The ordinance was identified as Ordinance No. O-053-2014 and set October 29, 2014 as the time for the beginning of the new survey.

[7] The Lafayette City-Parish actually filed the petition two days before the ordinance referenced therein was passed. However, in anticipation of the ordinance's passage, the Lafayette City-Parish requested that the Clerk of Court withhold service on the petition until after the ordinance was passed.

[8] Both Lafayette and Vermilion Parishes are a part of the Fifteenth Judicial District.

additional pleadings, including a reconventional demand seeking to set aside the State Land Office's original survey and report. Subsequent filings by the Vermilion Police Jury included a peremptory exception of prescription.

The issues went to trial on February 2, 2015, and after considering the evidence presented, the trial court rendered judgment in favor of the Vermilion Police Jury. The judgment executed by the trial court on February 18, 2015, reads in pertinent part as follows:

> IT IS ORDERED, ADJUDGED AND DECREED that there be Judgment in favor of Vermilion Parish Police Jury and against Lafayette City-Parish Consolidated Government on the Suit for Declaratory Judgment. Specifically, the Court decrees that the 2002 Joint Cooperative Endeavor Agreement and Intergovernmental Agreement between the Vermilion Parish Police Jury and Lafayette City-Parish Consolidated Government for the re-establishment of a portion of the existing common boundary between Vermilion and Lafayette Parishes is valid, enforceable, and binding on the parties, and further that the survey and report of the State Land Office dated August 13, 2003 which re-established a portion of said existing common boundary between the parishes is recognized and confirmed;
>
> IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the Reconventional Demand filed by Lafayette City-Parish Consolidated Government seeking to set aside the State Land Office survey dated August 13, 2003, on the grounds of gross error, be and is hereby dismissed, with prejudice;
>
> IT IS ORDERED, ADJUDGED AND DECREED that the claims of nullity asserted by Lafayette City-Parish Consolidated Government relative to the 2002 Joint Cooperative Endeavor Agreement and Intergovernmental Agreement between Vermilion and Lafayette Parishes are untimely. Therefore, the Peremptory Exception of Prescription filed on behalf of the Vermilion Parish Police Jury is hereby sustained, dismissing Lafayette City-Parish Consolidated Government's nullity claim, with prejudice;
>
> IT IS FURTHER ORDERED, ADJUDGED AND DECREED that the rights of Vermilion Parish Police Jury are reserved to apply for injunctive relief in the event Lafayette City-Parish Consolidated Government undertakes any acts contrary to the Joint Cooperative Endeavor Agreement and Intergovernmental Agreement or this Judgment[.]

The Lafayette City-Parish perfected this appeal, asserting two assignments

4

of error:

1. The District Court manifestly erred in finding that the Cooperative Endeavor Agreement was not an absolute nullity and thus prescribed.

2. The District Court manifestly erred in finding that the survey of the west segment of the Lafayette-Vermilion Parish boundary line conducted pursuant to the Cooperative Endeavor Agreement did not contain gross error.

These assignments of error overlap and will be considered together.

## OPINION

The Lafayette City-Parish's assignments of error both hinge on the argument that while the purpose of the Intergovernmental Agreement was to locate and fix the existing boundary between the two parishes, it had the effect of unlawfully changing the boundaries without the approval of the electors of both parishes. That being the case, the Lafayette City-Parish argues, the Intergovernmental Agreement is an absolute nullity. It further argues that, should the Intergovernmental Agreement be found to be an absolutely null contract, then the fact that Lafayette waited eleven years after signing the Intergovernmental Agreement to challenge its validity is immaterial, because a claim of absolute nullity is imprescriptible.

The Vermilion Police Jury agrees that if the intent of the Intergovernmental Agreement had been to change the boundary between the two parishes, voter approval would have been required. Louisiana Constitution Article 6 § 1(B) provides in pertinent part that "[t]he legislature by law may . . . change parish boundaries if approved by two-thirds of the electors in each parish affected voting thereon at an election held for that purpose."[9] However, the Vermilion Police Jury

---

[9] The legislature delegated some of this authority in La.R.S. 33:141 by allowing parishes to change boundaries by ordinance approved in a special election. The ordinance must receive two-thirds of the total votes in each parish. La.R.S. 33:145.

points out that the clear language of the Intergovernmental Agreement establishes that its purpose was not to "change or alter" the boundary between the two parishes, but to "re-establish" its actual location, and that can be accomplished without the ballot box approval of the electors of each parish through an Intergovernmental Agreement.

We find merit in the Vermilion Police Jury's argument relative to this point. Louisiana Revised Statutes 50:221 to 50:228 establishes a procedure whereby a governing authority of a parish can take unilateral action to ascertain and fix the boundary line between two parishes without the need for a confirmation election. To that end, La.R.S. 50:221 provides in pertinent part:

> Whenever the governing authority of any parish desires to ascertain and fix the boundary line of any adjoining parish, it shall pass an ordinance to that effect fixing a time and place for starting the running of the boundary. It shall then serve the presiding officer of the governing authority of the adjoining parish with a copy of the ordinance and with notice, at least six months in advance, of the time and place of starting the running of the boundary.

In fact, this is the authority relied upon by the Lafayette City-Parish in the April 23, 2014 ordinance, and forms the basis of its April 21, 2014 filing.

However, La.R.S. 50:221 is not the exclusive method for ascertaining and fixing a boundary. In *Rapides Parish Police Jury v. Grant Parish Police Jury*, 05-268, p. 37 (La.App. 3 Cir. 2/22/06), 924 So.2d 357, 381, *writ denied*, 06-1151 (La. 9/15/06), 936 So.2d 1269, this court concluded that La.R.S. 50:221 "is a procedural statute to be used by the parishes to jointly survey a line before resorting to the courts for a judicial fixing of a disputed boundary line[,]" but that "this statute does not prohibit the parishes from entering into an agreement as to the interpretation of an existing boundary."

A clear alternative to the adversarial approach of La.R.S. 50:221 is found in La.Const. art. 7, § 14(C) which provides in pertinent part that "[f]or a public

6

purpose . . . political subdivisions . . . may engage in cooperative endeavors with each other[.]" In this case, the Lafayette City-Parish and the Vermilion Police Jury entered into a cooperative endeavor under the terms of the 2002 Intergovernmental Agreement "to re-establish the location of portions of the parish boundary[.]" Both public bodies further "agreed to accept the findings of the State Land Office's survey[.]"

Notwithstanding the clear language of the Intergovernmental Agreement establishing its intent and the legal authority for ascertaining and fixing a boundary between adjoining parishes, the Lafayette City-Parish argues that its complaint is less about the *purpose* of the Intergovernmental Agreement, and more about the *result* of that agreement. Specifically, the Lafayette City-Parish argues that while the cause of the Intergovernmental Agreement may have begun as an effort to ascertain and fix the boundary, it resulted in an unlawful change of the historic boundary set by the legislature in 1844 La. Acts No. 81. This final result, the Lafayette City-Parish argues made the ultimate cause of the Intergovernmental Agreement unlawful—one that violated a rule of public order.

Louisiana Civil Code Article 1906 provides that "[a] contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished." If any of the requirements for the formation of a contract are not met, the contract itself is considered to be null. La.Civ.Code art. 2029. A requirement of any contract is that of lawful cause because "[a]n obligation cannot exist without a lawful cause." La.Civ.Code art. 1966. Additionally, "[t]he cause of an obligation is unlawful when the enforcement of the obligation would produce a result prohibited by law or against public policy." La.Civ.Code art. 1968.

Louisiana Civil Code Article 7 states that "[p]ersons may not by their juridical acts derogate from laws enacted for the protection of the public interest.

7

Any act in derogation of such laws is an absolute nullity." Additionally, La.Civ.Code art. 2030 states in pertinent part that "[a] contract is absolutely null when it violates a rule of public order, as when the object of a contract is illicit or immoral." Furthermore, an "[a]ction for annulment of an absolutely null contract does not prescribe." La.Civ.Code art. 2032.

Whether the cause of the Intergovernmental Agreement was lawful is a question of law, and the trial court found that the cause was lawful. "Appellate review of questions of law is to discern whether the district court's interpretative decision is legally correct. If legal error is found, the legal conclusions of the district court are thus subject to *de novo* review by this Court." *Forum for Equality PAC v. McKeithen*, 04-2477, 04-2523, p. 10 (La. 1/19/05), 893 So.2d 715, 723 (citations omitted).

We find no error in the trial court's determination that the cause of the Intergovernmental Agreement was lawful. The language of the document sets forth the clear intent of the parties, which is consistent with statutory authority to "ascertain and fix the boundary line" between the two parishes. La.R.S. 50:221. Having reached this conclusion, we turn to the Lafayette City-Parish's argument that the ultimate result reached through the Intergovernmental Agreement is unlawful.

Specifically, the Lafayette City-Parish argues that the survey completed by the State Land Office failed to use the best evidence available in ascertaining the historic boundary line and that this constituted "gross error" as that term is used in La.R.S. 50:128. That statute reads as follows:

> All surveys or re-surveys, and the plats thereof, approved by the Register of the State Land Office, are binding on all parties, and copies thereof, certified by the clerk of court or by the Register of the State Land Office, are conclusive evidence of the correctness thereof in any court. *No court may set aside any such approved survey, re-*

8

*survey, or plat except in a direct action brought for that purpose on the ground of fraud or gross error in the making of the survey.* If a survey is set aside in this manner, a re-survey may be made as provided in this Chapter. Only the executive department of the government may make and correct surveys or re-surveys approved by the Register of the State Land Office. No court shall alter or amend in any way any part of an approved survey or re-survey or the plat thereof.

(Emphasis added).

With regard to its decision concerning the accuracy of the 2003 State Land Office survey, the trial court considered the testimony of three surveyors: John P. Evans Jr., who performed the survey; Michael Philip Mayeux, who testified on behalf of Lafayette City-Parish; and Eugene Sellers, who testified on behalf of the Vermilion Police Jury. The litigants also provided the trial court with numerous surveys, maps, correspondence, and other documents as exhibits.

Mr. Evans, who testified by deposition, stated that before performing the physical survey, he researched the records of the State Land Office for reference material as well as the parish depositories, and combined all of the accumulated information to formulate his conclusion as to the location of the boundary.[10] When going back to the source of the boundary line, the legislative Act creating Vermilion Parish, Mr. Evans found that description to be of little assistance because the legislature used physical reference points that could not be ascertained with any degree of certainty.[11]

The turning point in Mr. Evans' research was a notation on one 1956 survey map prepared by a surveyor named Joseph E. Schexnaider and containing the following notation referencing the boundary at issue: "The parish line is located

---

[10] He noted in his testimony the older maps were inconsistent in pinpointing the boundary location, but that he recognized this to be a normal finding because "each particular map maker had his own version of where he believed [the boundary] lines to be."

[11] Mr. Evans used as an example the legislature's reference to Granger's Coulee to identify the boundary, and that reference could mean different things to different people.

according to a map of a survey made by Bernard Engineers Incorporated in 1931 showing said line as established by Act No. 81 of the Louisiana Legislature of 1844 and is regarded as the official line[.]" A subsequent search by Mr. Evans did not recover a copy of the Bernard Engineers map, but Mr. Evans did locate and interview Mr. Schexnaider. At the end of that interview, Mr. Schexnaider provided Mr. Evans with a survey plat of a January 1976 partition of immovable property overlapping the parish property lines and using the Bernard Engineers' location of the property line as a reference point. In relating this information to all that he had already evaluated, and finding that local surveyors were using the Bernard Engineers property line location in their work, Mr. Evans found this to be very persuasive information in his subsequent survey work.

Mr. Mayeux testified as to all of his research in the area as well, and the fact that he often used the field notes of John Campbell, a surveyor who worked in the area in the early 1850s, and Joseph Irwin, a surveyor who worked the area in 1817, to establish landmarks. In his opinion, the information derived from these field notes was more accurate, and therefore, more persuasive than the sources used by Mr. Evans in that the field notes referenced the physical landmarks mentioned in the legislative Act creating Vermilion Parish. However, with regard to Mr. Evans' research, the following exchange took place between counsel for the Lafayette City-Parish and Mr. Mayeux:

> Q. All right. In your opinion as a surveyor, should [Mr. Evans] have relied upon [the field notes of Irwin and Campbell], should he have found those to show the best evidence of where those two points were?

> A. You know, it's my opinion that it represents the best evidence of the location of the boundary being described. You know, I would have looked for – and did look for verification. But then, again, it just – the difference, I guess I would say, is that I was probably more aware because of earlier work that I had done in the *Lamson/Hallwood* cases that evidence of this sort existed and, you

10

know, I had experience and I knew that it existed and I knew to go seek it out. I would guess that would be the difference.

Mr. Sellers testified that he had been performing civil engineering and survey work in Lafayette and Vermilion Parishes for approximately fifty-seven years. He was familiar with the State Land Office 2003 report, had read Mr. Evans' deposition, and was familiar with the documents relied on by Mr. Evans in preparing his survey. According to Mr. Sellers, the purpose of the Bernard Engineers survey was "to establish the line between Vermilion and Lafayette Parish as created by the legislature in the Act of 1844." He testified that he was also familiar with the Irwin and Campbell field notes and was of the opinion that those field notes "had nothing to do with the survey of the parish boundary." Instead, their purpose was assist in locating sections in the area. Mr. Sellers was of the opinion that Mr. Evans' survey was conducted according to generally accepted surveying practices by relying on the references that he did.

The credibility of the evidence presented at trial is a question of fact and it is well settled that an appellate court cannot set aside a trial court's findings of fact in the absence of manifest error or unless those findings are clearly wrong. *Rosell v. ESCO*, 549 So.2d 840 (La.1989). If the findings are reasonable in light of the record reviewed in its entirety, an appellate court may not reverse those findings even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently. *Id.* In order to reverse a fact finder's determination of fact, an appellate court must review the record in its entirety and (1) find that a reasonable factual basis does not exist for the finding, and (2) further determine that the record establishes that the fact finder is clearly wrong or manifestly erroneous. *Stobart v. State, DOTD*, 617 So.2d 880 (La.1993). The trial court did not state which evidence it found most persuasive or why in its reasons

11

for judgment.

This court has reviewed all of the evidence presented at trial as well as the expert witness testimony. In doing so, we find no manifest error in the trial court's conclusion that the Lafayette City-Parish failed to establish that the August 13, 2003 State Land Office boundary report was the product of gross error and resulted in the change of the boundary line between Lafayette and Vermilion Parishes rather than the ascertaining and fixing of the boundary. We find no merit in the Lafayette City-Parish's assignments of error.

## DISPOSITION

For the foregoing reasons, we affirm the trial court's judgment granting the Vermilion Parish Police Jury's declaratory judgment and peremptory exception of prescription and dismissing Lafayette's reconventional demand. We assess all costs of this appeal to the Lafayette City-Parish Consolidated Government, and set the amount of those costs at $ 94.05 pursuant to La.R.S. 13:5112.

**AFFIRMED.**